## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## Tampa Division

AMERILIFE HOLDINGS, LLC;
NETWORK INSURANCE SENIOR
HEALTH DIVISION ALG, LLC;
AMERILIFE MARKETING GROUP, LLC,

*Plaintiffs,*

v.

Civ. Action No. _____

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, in her official capacity
as the Administrator for the Centers for
Medicare and Medicaid Services;
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and XAVIER
BECERRA, in his official capacity as the
Secretary of Health and Human Services,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AmeriLife Holdings, LLC, Network Insurance Senior Health Division ALG, LLC, and AmeriLife Marketing Group, LLC (collectively "AmeriLife") allege and state as follows:

## INTRODUCTION

1.     This lawsuit concerns a paradigm-shifting new Rule purporting to regulate the compensation of independent insurance agents and brokers who enroll beneficiaries in Medicare Advantage and Part D health care plans.  The final Rule was published at 89 Fed. Reg. 30,448 (April 23, 2024) and codified in relevant part at 42 C.F.R. §§ 422.2274, 423.2274.

2.     The Rule's central feature is a cap on payments to agents and brokers that includes not only "compensation"—as Defendant Centers for Medicare & Medicaid Services ("CMS") has construed the term for 16 years—but also "administrative payments" made directly to those agents.  That redefinition of a settled statutory term exceeds the agency's authority.  But at least the agency's rulemaking process provided some semblance of notice that the agency is taking that new step.

3.     By contrast, CMS fails that fundamental requirement for its apparent attempt to extend the fraught Rule—based on broad, conflicting, and confusing statements in the preamble—to cut off payments from carriers to third-party Field Marketing Organizations ("FMOs").  Critically, FMOs (which compose the lion's share of AmeriLife's business) do not themselves enroll beneficiaries.  Rather, using the payments they receive from multiple carriers as a pool of funding, FMOs

2

train, manage, and support (in a carrier-agnostic manner) a network of independent agents and brokers who enroll seniors in Medicare Advantage plans.

4.      CMS's unprecedented move with respect to carrier-to-FMO payments defies law and logic many times over.  It plainly exceeds CMS's statutory authority to regulate the "use of compensation" to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. 1395w-21(j)(2)(D).  It also arbitrarily and capriciously thwarts FMOs' ability to provide agent and broker oversight and support services that are essential to fulfilling the Medicare Act's purposes.  And it tramples basic procedural requirements designed to ensure the meaningful stakeholder participation that could have averted this problem.

5.      Yet CMS's steadfast refusal to clarify the Rule's impact (if any) on carrier-to-FMO payments for a range of agent-support services has paralyzed the ability of carriers and FMOs to enter into contracts for the next plan year—which must be finalized by the end of July due to a series of cascading deadlines—to the detriment of the entire industry and ultimately the Medicare beneficiaries it serves.

6.      That agency-created predicament has left AmeriLife no choice but to seek relief from this Court: either a declaration that the Rule does not apply to carrier-to-FMO payments that are not passed along to agents and brokers, or an order preventing operation of the Rule to prohibit such payments.

7.      The Rule, and Defendants' ongoing refusal to clarify its scope vis-à-vis FMOs, impose irreparable harm by impeding AmeriLife from negotiating time-

sensitive contracts with Medicare carriers to provide critical services that support a large network of independent agents and brokers who enroll beneficiaries.  The government has no interest in enforcing an unlawful regulation, which in this case would ultimately deprive Medicare beneficiaries of the guidance and information they need to make informed decisions about the plans that best match their health care needs.

8.    To stave off that irreparable harm and injury to the public interest, AmeriLife will imminently file a motion for preliminary injunctive relief.  That relief is needed by the end of July 2024, at which point agreements for next year must be finalized.

9.    To be clear, AmeriLife does not seek to invalidate or enjoin the main thrust of the Rule in capping total payments from carriers *to agents and brokers*. Rather, it simply seeks to ensure that the Rule does not extend to payments from carriers *to FMOs* that have nothing to do with agent-and-broker compensation incentives.   That modest relief is necessary to avoid the harm threatening AmeriLife and the existing FMO business model.

## JURISDICTION AND VENUE

10.    This action is brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*.

11.    This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because Plaintiffs AmeriLife Holdings, LLC, Network Insurance Senior Health

Division ALG, LLC, and AmeriLife Marketing Group, LLC all reside in this District and because a substantial part of the events or omissions giving rise to the claims and injuries occurred and will continue to occur in this District.

## **PARTIES**

13.     Plaintiff AmeriLife Holdings, LLC is a holding company organized in Delaware and headquartered in Clearwater, Florida.  Its subsidiaries include Plaintiffs AmeriLife Marketing Group, LLC and Network Insurance Senior Health Division ALG, LLC, which are both FMOs headquartered and doing business in Clearwater, Florida.

14.     AmeriLife's FMO business provides vital services to manage and support independent agents and brokers who help Medicare beneficiaries to identify and enroll in the Medicare Advantage plan best suited to their health care needs.  (Other AmeriLife entities employ or engage agents and brokers, and contract with captive agents, but this Complaint does not pertain to those smaller lines of business.)

15.     Defendant Department of Health and Human Services ("HHS") is a cabinet-level executive branch department of the federal government that, among other responsibilities, administers the Medicare program.

16.     Defendant Xavier Becerra is HHS Secretary.  He signed the final Rule. 89 Fed. Reg. at 30,848.  He is sued in his official capacity.

17.     Defendant CMS is a federal agency within HHS that, among other responsibilities, handles day-to-day operations and administration of the Medicare program.

18.     Defendant Chiquita Brooks-LaSure is CMS Administrator.   She approved the Rule and is responsible for its implementation and enforcement.  89 Fed. Reg. at 30,812.  She is sued in her official capacity.

## FACTUAL ALLEGATIONS

### I.     LEGAL AND FACTUAL BACKGROUND

#### A.     Medicare Advantage Grows In Popularity Because It Affords Beneficiaries Plan Options

19.      Traditional Medicare is a single-payer, one-size-fits all public health benefit program.

20.     By contrast, Medicare Advantage ("MA"), or Medicare Part C, operates as a market through which Medicare beneficiaries can enroll in specific health care plans administered by Medicare Advantage Organizations, which are private insurance carriers that contract with CMS to sponsor MA plans.

21.     MA has grown in popularity because it enables beneficiaries to select plans that best meet their individual needs from a wide range of options—often with lower or even no cost to the beneficiary—averaging around 40 available plans for each beneficiary.  Over 30 million beneficiaries are enrolled in MA as of 2023, which represents over half of the total Medicare population.

22.     Medicare Part D, a federal prescription drug benefit program with around 50 million enrollees across various prescription drug plans, operates

similarly.  To enhance readability, this Complaint cites only to the MA regulations, but the claims herein apply equally to the materially identical Part D regulations.

23.     Carriers use a variety of methods to locate and engage with beneficiaries who may be interested in enrolling in a MA plan.  Historically, most carriers used employed or "captive" agents and brokers who sold only one carrier's plans directly to beneficiaries.  Because that model limited the choices offered to beneficiaries and required carriers to bear the significant cost of maintaining their own agent-and-broker networks, carriers have increasingly shifted to contracting with independent agents and brokers to sell MA plans.

24.     Outside the "captive" agent model, carriers generally contract with, and make payments to, three different types of parties: (i) independent agents and brokers who contract with multiple carriers directly; (ii) firms that employ or engage their own agents and brokers; and (iii) FMO entities that maintain a network of independent contractor agents and brokers.

### B.      <u>AmeriLife FMOs Provide Critical Services That Support Independent Agents and Brokers</u>

25.     Plaintiffs AmeriLife Marketing Group and Network Insurance Senior Health Division ALG, Clearwater-based FMOs, fit into the third category.  Along with other AmeriLife FMO affiliates across the country, they recruit independent agents and brokers who help beneficiaries to identify and enroll in the MA plans best suited to the individuals' health care needs.  Dozens of national and local carriers of all sizes partner with AmeriLife, which in turn facilitates the contracting

of the independent agents and brokers in AmeriLife's FMO networks with such carriers.  That enables carriers to work with a diverse sales network, and independent agents and brokers to introduce beneficiaries to a wide variety of MA plans.

26.     AmeriLife provides a range of vital services to independent agents and brokers using the pooled funds it collects from various carriers.  These agent-support services do not compensate agents, but rather provide them the training, certifications, and other tools to perform their jobs effectively and in compliance with the law.  For example:

   a.     AmeriLife manages the mandatory broker-and-agent State licensing and appointment processes, which relieves agents and brokers of the significant administrative burden involved with navigating these processes across different carriers.

   b.     AmeriLife provides leading enrollment and post-enrollment technologies that permit independent agents and brokers to better assist beneficiaries in comparing health insurance options across carriers.

   c.     AmeriLife assists independent agents and brokers in keeping pace with key product updates, market trends, changes in carrier procedures, technological advancements, and general business coaching.

       d.     AmeriLife offers brokers and agents training and education services on an array of products and regulatory requirements.

       e.     AmeriLife develops, reviews, and distributes marketing materials that help beneficiaries understand the products they are considering and potentially enrolling in, and assists with compliance with carrier requirements and applicable CMS rules.

       f.     AmeriLife assists brokers and agents in its network to respond to customer complaints and/or regulatory inquiries.

27.    Together, these critical services ensure that agents and brokers are appropriately licensed, trained, and informed, and have the best tools to assist MA beneficiaries nationwide in selecting the MA plan that is in their best interest for their health care needs, and thereby help carriers discharge their oversight duties.

### C.    CMS Has Long Permitted Administrative Payments To FMOs Based On Fair Market Value

28.    The Medicare Improvements for Patients and Providers Act of 2008 granted limited authority to the HHS Secretary to regulate how carriers compensate agents and brokers for enrolling beneficiaries in MA plans.  The Secretary must "establish limitations with respect to . . . [t]he use of compensation other than as provided under guidelines established by the Secretary."  42 U.S.C. § 1395w-21(j)(2)(D)*; see also id.* § 1395w-104(*l)(*2) (incorporating this section by reference for purposes of Part D).  The guidelines "shall ensure that the use of

compensation creates incentives for agents and brokers to enroll individuals in the . . . plan that is intended to best meet their health care needs." *Id.* § 1395w-21(j)(2)(D).

29.    Pursuant to a subdelegation of the Secretary's authority, CMS in 2008 promulgated regulations distinguishing between two types of payments: "compensation" and "[p]ayments other than compensation (administrative payments)." 42 C.F.R. § 422.2274(d)-(e).

30.    "Compensation" has been defined to include "monetary or non-monetary remuneration of any kind relating to the sale or renewal of a plan or product offered by" a carrier, including but not limited to commissions, bonuses, gifts, and prizes or awards.  42 C.F.R. § 422.2274(a)(i).  Until the new Rule, it expressly excluded "fees to comply with State appointment laws, training, certification, and testing costs," "[r]eimbursement for mileage to, and from, appointments with beneficiaries," and "[r]eimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials." *Id.* § 422.2274(a)(ii).  The regulation (before and after promulgation of the new Rule) subjects "compensation" to price caps that "only apply to independent agents and brokers."  *Id.* § 422.2274(d).  The regulation does not define the terms "agent," "broker," or "independent agents and brokers."

31.    Carrier payments to FMOs for various administrative services they provide, by contrast, have not been subject to government price caps.  Instead, before the new Rule, the only restriction on such payments was that they may not

"exceed the value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1). That position arises from the settled recognition that payments to FMOs for "training, customer service, agent recruitment, [and] operational overhead" are "made for services other than enrollment of beneficiaries," *id.*, yet may "be based on enrollment," *id.* § 422.2274(e)(2).

32.     Based on that longstanding regulatory landscape, AmeriLife and other FMOs have invested extensive time and resources into developing a robust business model that relies on carriers paying FMOs fair market value for the numerous services they provide to help manage and support a large independent network of agents and brokers.  CMS has repeatedly affirmed this status quo over the past 16 years.  *See, e.g.*, Contract Year 2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017) (requiring fair market value for "[p]ayments made to third parties for services other than enrollment of beneficiaries (e.g., training, customer service, or agent recruitment)").[1]

**D.     CMS's Final Rule, For the First Time, Classifies Administrative Payments As Compensation**

33.     In a notice of proposed rulemaking in late 2023, *see Medicare Program; Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications*, 88 Fed.

---

[1] https://www.cms.gov/medicare/health-plans/managedcaremarketing/downloads/cy-2018-medicare-marketing-guidelines_final072017.pdf.

Reg. 78,476 (Nov. 15, 2023), CMS proposed a radical change in the relationship between administrative payments and compensation—and did so in a way that left the industry deeply confused as to which parties are intended to be regulated. Despite comments from FMOs, carriers, and independent agents and brokers expressing serious concerns about the potential disruption, CMS hastily issued the final Rule in April 2024 and made it "effective June 3, 2024"—just in time "for all contract year 2025 marketing and communications beginning October 1, 2024." 89 Fed. Reg. at 30,448.

34.    The rulemaking targeted what CMS perceived to be circumvention of the compensation caps via administrative payments made to independent agents and brokers themselves.  *See, e.g.*, 89 Fed. Reg. at 30,449 (carriers "have structured payments to agents and brokers that allow for separate payments for these agents and brokers and have the effect of circumventing compensation caps").  Other than touching on the ancillary (and unsupported) problem of FMOs "pass[ing] on" money to agents and brokers as carrier-specific "bonuses or additional payments," *id.* at 30,620, CMS never raised any circumvention risks associated with the longstanding model of carriers paying FMOs to provide various administrative services that support the distribution of MA products.

35.    Under the new Rule, for the first time, administrative payments "are *included* in the calculation of enrollment-based compensation." 89 Fed. Reg. at 30,829 (42 C.F.R. § 422.2274(e)(2) (as amended)) (emphasis added).  Moreover, rather than allowing payment for administrative services at fair market value, CMS

set a one-time $100 increase to the compensation cap (to be adjusted annually) "to account for administrative payments [now] included under the compensation rate." 89 Fed. Reg. at 30,829 (42 C.F.R. § 422.2274(a) (as amended)).  At the same time, the Rule's actual text still provides that "compensation requirements only apply to independent agents and brokers," 42 § C.F.R. § 422.2274(d); *see* 89 Fed. Reg. at 30,829, and nowhere caps or prohibits administrative payments to entities other than independent agents and brokers (such as FMOs).

36.    The ambiguity as to whether the new Rule reaches carrier-to-FMO payments (at least those not passed on to agents) has produced significant confusion and uncertainty throughout the industry.    AmeriLife and other stakeholders have unsuccessfully sought guidance from CMS.  The agency's refusal to clarify the Rule's impact (if any) on carrier-to-FMO payments for agent-support services has impeded AmeriLife's (and other FMOs') ability to enter into contracts with carriers for next year—which must be negotiated by the end of July—as neither AmeriLife nor its carrier partners have a definitive interpretation of how the regulations apply to FMO services for the 2025 annual enrollment period.  To the extent carriers must construe the Rule to prohibit the existing FMO business model, it will require significant restructuring and endanger the provision of critical FMO services to independent agents and brokers.

### E.    **AmeriLife Faces Imminent Harms**

37.    AmeriLife faces serious harms that are irreparable, including but not limited to financial harms for which it has no recourse in light of the government's sovereign immunity.

38.    The severe uncertainty created by the ambiguous scope of the final Rule vis-à-vis carrier payments to FMOs—and the risk that it is construed to prohibit (unlawfully) those payments—are impeding AmeriLife's efforts to negotiate and finalize contracts for the upcoming plan year. The clock is ticking. Marketing activities for 2025 enrollment begin on October 1, 2024. Preparations by carriers, FMOs, agents, and brokers would typically be well underway. AmeriLife's work to recruit, train, and license a robust network of agents and brokers cannot begin until the contracts with carriers are finalized. Accordingly, to make that "narrow timeline" work (89 Fed. Reg. at 30,621), AmeriLife must finalize its contracts with carriers by the end of July 2024 to be able to serve independent agents and brokers in the 2025 plan year.

39.    Yet AmeriLife lacks sufficient clarity to negotiate the type of contracts that parties would otherwise enter.

40.    In addition, AmeriLife has had to devote substantial time to predict and plan for various scenarios, including speaking with carriers continuously in an effort to gain insight into their plans and analyzing the different ways in which carriers might proceed. This resource-consuming diversion carries significant opportunity costs as AmeriLife's executive leadership team has less attention to

devote to other aspects of the business while it plans for uncertain scenarios for the 2025 annual enrollment period.

41.     Application of the Rule to FMOs would upend the business model of AmeriLife's FMOs in the Medicare Advantage space.   CMS would prevent AmeriLife from recovering fair market value for the broad array of critical services its substantial work and investments have developed to ensure beneficiaries can enroll in the best MA plan for their individual health care needs.   AmeriLife—as well as the carriers it contracts with and the independent agents and brokers who rely on its services—would be forced to alter several of the arrangements that have long been core to its business.

42.     A declaration that the Rule does not apply to payments from carriers to FMOs for agent-support services, or an order enjoining or staying such operation of the Rule, would preserve the government's and public's interests in promoting informed beneficiary choice among MA plans, as reflected in the statute.   42 U.S.C. § 1395w-21(j)(2)(D).

43.     In contrast, denying relief will help no one.   CMS did not explain why its Rule should apply to FMOs—indeed, there is substantial doubt as to whether CMS even intends for the Rule to do so.   Beyond that, the Rule at a minimum has injected a massive amount of unproductive uncertainty into the MA market, with no clear purpose (at least as applied to the longstanding FMO business model).

44.     If the rule encourages carriers to gravitate away from independent agents and brokers, and move back to a "captive" agent model, that would limit

consumer choice, leave beneficiaries less informed, and reduce competition among carriers and plans—all of which CMS itself recognizes is contrary to the public interest.  *See* 89 Fed. Reg. at 30,618-30,619.

## II.   AmeriLife Is Entitled To A Declaration Clarifying That The Rule Does Not Apply To Payments From Carriers To FMOs

45.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  That maxim carries particular force when an "abrupt" "regulatory change" threatens to displace longstanding expectations and reliance interests without affording regulated parties adequate "know[ledge] [of] what is required of them so they may act accordingly."  *Id.* at 253-254.

46.     CMS's Rule violates that basic tenet.  Until the new Rule, payments for reimbursements and "services other than enrollment of beneficiaries" have not been subject to "compensation" limitations.  42 C.F.R. § 422.2274(e)(1).  The new Rule substantially broadens the definition of "compensation" (capped by CMS) to encompass reimbursements and other "administrative payments" made to agents and brokers directly.  89 Fed. Reg. at 30,829.  The Rule presumably also applies to administrative payments from carriers to FMOs that are "passed on" to agents and brokers as a way of evading compensation limits for enrolling beneficiaries.  *Id.* at 30,620.  But the Rule fails to clarify whether it applies to carrier-to-FMO payments not passed on in that manner.

47.    On one hand, the Rule itself leaves in place the current regulatory text specifying that the compensation requirements in subparagraph (d) (which are subject to the agency-determined cap) "only apply to independent agents and brokers."  42 C.F.R. § 422.2274(d); *see* 89 Fed. Reg. at 30,829.  And nothing in subparagraph (d) purports to govern payments to an FMO.  Indeed, the preamble states expressly that the Rule is "limited to independent agents and brokers, and do[es] not extend to [third-party marketing organizations, including FMOs] more generally"; nor does it "extend to placing limitations on payments from [a carrier] to a [third-party marketing organization] who is not an independent agent or broker for activities that are not undertaken as part of an enrollment."  89 Fed. Reg. at 30,626; *see also id.* at 30,802 (CMS does "not believe" that "simultaneously eliminat[ing] administrative payments but provid[ing] for higher compensation per enrollee" "will have an adverse effect, either on [third-party marketing organizations], FMOs, or independent brokers").

48.    On the other hand, different preamble language implies that carrier-to-FMO payments may nevertheless be swept up in the new Rule.  For example, the preamble suggests that carriers should begin "making the full [administrative] payments directly to the agents and brokers" and that the Rule would "prohibit separate administrative payments."  89 Fed. Reg. at 30,622, 30,624.  It also suggests that carriers *"and the [third-party marketing organizations] that they contract or work with* will need to begin to comply with these updated standards[.]"  *Id.* (emphasis added).

49.    The best way to reconcile these conflicting and confusing statements is to conclude that, whatever else the Rule purports to govern, it at least does not apply to payments from carriers to FMOs for largely carrier-agnostic agent-support services—namely, "training, customer service, agent recruitment, [and] operational overhead." 42 C.F.R. § 422.2274(e)(1). Such services—*i.e.*, the bread and butter of the FMO business model—do not influence agents to favor any particular plan, but are in place to assist agents and brokers in finding the best plan for their beneficiaries. Indeed, the individual agents and brokers who interact with beneficiaries are often wholly unaware of the carriers' payments to FMOs. Thus, this reading fully aligns with CMS's asserted goal of preventing administrative payments from "being used as a mechanism to effectively pay agents and brokers enrollment compensation amounts in excess" of fair-market value. 89 Fed. Reg. at 30,622.

50.    AmeriLife and other FMOs have asked CMS to clarify that the Rule operates in this straightforward manner. But CMS so far has refused to provide such guidance. As a result, confusion over the scope of the Rule is paralyzing the ability of carriers and FMOs to enter in agreements for next year or, at minimum, forcing carriers and FMOs to make suboptimal contingency plans.

51.    A declaration that the Rule does not govern carrier-to-FMO payments (not passed on to agents and brokers)—or a stipulation from Defendants as to the same—would redress the confusion hampering the contractual relationships that are core to AmeriLife's MA FMO business and obviate the need to resolve the "fair

notice" question and other serious questions presented under the Administrative Procedure Act ("APA"). Such a declaration reflects the most sensible construction of the Rule's text—not to mention CMS's limited authority, as discussed below—and supports the relief requested here.

### III. Alternatively, If The Rule Is Construed To Apply To Carrier-to-FMO Payments, It Is Unlawful And Should Be Vacated

52. In the alternative, if the Rule applies to carrier-to-FMO payments (not passed on to agents and brokers), it is unlawful and should be vacated, and Defendants should be enjoined from implementing or enforcing it with respect to AmeriLife, its affiliates, and its subsidiaries, because (i) CMS exceeded its statutory authority; (ii) the Rule is arbitrary and capricious; and (iii) CMS did not observe procedural requirements.

### A. CMS Would Exceed Its Statutory Authority By Applying The Rule To Payments From Carriers To FMOs For Agent-Support Services

53. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Congress directed CMS to "establish limitations" on "use of compensation" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). Invoking that authority, *see* 89 Fed. Reg. at 30,617, the Rule, for the first time, sets a fixed rate for administrative payments by dictating that those payments are "included in the calculation of enrollment-based

compensation" for agents and brokers.   42 C.F.R. § 422.2274(a), (e)(2) (as amended).

54.   If applied to administrative payments from carriers to FMOs, the Rule would exceed CMS's authority because it neither accords with the ordinary meaning of "compensation" (including as long understood by the agency) nor comports with how that term is used in the relevant statutory context.

55.   *First*, CMS may not redefine a statutory term in a manner that conflicts with Congress's intent.  "[B]ecause we assume that Congress uses words in a statute as they are commonly understood," "compensation" (undefined in the statute) carries its "ordinary and plain meaning," as principally illustrated in "everyday dictionaries." *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021); *see Spencer v. Specialty Foundry Prods. Inc.*, 953 F.3d 735, 740 (11th Cir. 2020) (looking to "both popular and legal dictionaries" (internal quotation marks omitted)).  Dictionaries principally define "compensation" as "[r]emuneration and other benefits received *in return for services rendered*." *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019) (emphasis added) (quoting *Compensation*, BLACK'S LAW DICTIONARY (11th ed. 2019)); *see also, e.g.*, *Webster's Third New International Dictionary* 463 (1993); *Webster's New World Dictionary* 289 (2d College ed. 1972).

56.   In line with that common understanding, the agency has traditionally defined administrative "[p]ayments made for services other than enrollment of beneficiaries"—such as "training, customer service, agent recruitment, operational

overhead, or assistance with completion of health risk assessments"—as "[p]ayments *other than compensation*."   42 C.F.R. § 422.2274(e)(1) (emphasis added); *see* 73 Fed. Reg. 54,226, 54,251 (Sept. 18, 2008) ("compensation . . . [d]oes not include" payments to FMOs for their administrative services).   Instead, such carrier-to-FMO administrative payments merely "must be fair-market value . . . commensurate with the amount that [a carrier] paid to a third party for similar services." 73 Fed. Reg. 67,406, 67,410 (Nov. 14, 2008).

57.   The Rule, however, extends the meaning of "[c]ompensation" far beyond the "[c]ommissions," "[b]onuses," "[g]ifts," "[p]rizes" and "[a]wards" some agents and brokers receive for enrollment-based services.   42 C.F.R. § 422.2274(a)(1)(A)-(D).   The term now also includes, as most relevant here, reimbursements for "fees to comply with state appointment laws, training, certification, and testing costs." 42 C.F.R. § 422.2274(a)(i)(E) (as amended). CMS thus purports to redefine *mandatory training and certifications* as "compensation." But costs that permit an agent to render a service in the first place cannot be remuneration for the service itself.

58.   *Second*, even if some elements of administrative payments from carriers *to agents and brokers* could be considered remuneration for services, the statutory context forecloses treating as "compensation" payments from carriers *to FMOs* that are not passed along to agents or brokers.   *See Catalyst Pharms*., 14 F.4th at 1307 ("[C]ourts do not read individual words or terms in isolation, but instead in light of their context within a particular text.").   Congress authorized

CMS to regulate "the use of compensation" only to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).  Even assuming that the authority to regulate how compensation is "use[d]" encompasses the power to set a fixed *amount* of compensation, Congress plainly confined such authority to compensation paid to individual agents and brokers for "enroll[ing]" particular "individuals."  *Id.*

59.   But carrier-to-FMO payments for administrative services are not designed to, and do not, cause independent agents to steer Medicare beneficiaries to enroll in any specific plan.  "The service payments that carriers pay AmeriLife do not get passed through to selling agents and brokers," who "represent multiple carriers."  Letter from Scott Perry, CEO of AmeriLife, to Office of the Sec'y, U.S. Dep't of Health & Hum. Servs. 4, 7 (Jan. 5, 2024) ("AmeriLife Comment Letter").[2] Rather, FMOs provide training, compliance, and other functions that the carriers would otherwise need to furnish themselves to support independent agents and brokers.  The FMOs do not advise individual beneficiaries which plans to enroll in, nor do FMOs tell individual agents and brokers which plans to sell.

60.   Accordingly, redefining compensation to include administrative payments made to FMOs would hardly "create[] incentives for agents and brokers to enroll individual[]" beneficiaries in the right plans or remove adverse incentives.

---

[2] https://perma.cc/C78D-J4RA.

42 U.S.C. § 1395w-21(j)(2)(D).  On the contrary, cabining such administrative payments—thus limiting the critical services FMOs provide—would only hamstring the ability of independent agents and brokers to identify and enroll beneficiaries in the plans that best match the beneficiaries' needs.  *See* AmeriLife Comment Letter 4-6, 9-10.  That is not the "use of compensation . . . for agents and brokers" Congress had in mind—or that Congress empowered CMS to regulate.

61.    A separate provision of CMS's Rule prohibits contractual terms that "interfere with the agent's or broker's ability to objectively assess and recommend" the best-fitting plan.  89 Fed. Reg. at 30,620; *see* 42 CFR § 422.2274(c)(13) (as amended).  This language does not provide an alternate path for CMS to restrict carrier-to-FMO payments, for the same reasons that CMS lacks statutory authority to make that regulatory change directly.

### B.    <u>The Rule Is Arbitrary And Capricious</u>

62.    If the Rule were read to restrict carrier-to-FMO payments not passed on to agents and brokers, it would also be arbitrary and capricious.  5 U.S.C. § 706(2)(a); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983) (rule is arbitrary when, among other reasons, the agency failed to "examine the relevant data and articulate a satisfactory explanation" or "entirely failed to consider an important aspect of the problem").  The Rule falls short of APA standards in several key respects.

63.    *First*, CMS failed to acknowledge the sea change the Rule causes.  While "[a]gencies are free to change their existing policies," they may do so only if

they "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  At a minimum, that standard means "the agency must at least 'display awareness that it is changing position'" and that its "longstanding policies may have 'engendered serious reliance interests that must be taken into account.'"  *Id.* at 221-222 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

64.  As explained, the Rule fundamentally upends the agency's longstanding position.  Industry participants warned that reconstructing "compensation" to include (and cap) administrative payments to FMOs would "pull the rug out from under" FMOs "with thousands of employees" that "have designed their business models on the assumption that expenses and administrative payments are not 'compensation'"—*i.e.*, "structured their contracts with carriers on that assumption, secured loans on it, and even based their initial public offerings on it."  Letter from Eugene Scalia of Gibson Dunn & Crutcher LLP to Office of the Sec'y, U.S. Dep't of Health & Hum. Servs. 20 (Jan. 5, 2024) ("Council for Medicare Choice Comment Letter")[3]; *see* AmeriLife Comment Letter 2 (warning about "significantly negative impacts on the industry and the Medicare beneficiaries who rely so heavily on independent agents for the purchase and servicing of health insurance products"); see *also, e.g.*, Letter from Bryan W. Adams, Co-Founder & Chief Exec. Officer of Integrity Marketing Group, LLC to

---

[3] https://perma.cc/45NQ-T3C3.

Chiquita Brooks-LaSure, Adm'r, Ctrs. for Medicare & Medicaid Servs. 7-10 (Jan. 5, 2024)[4]; Letter from Al Boulware, Gen. Counsel & Corp. Sec'y of SelectQuote, Inc. to Chiquita Brooks-LaSure, Adm'r, Ctrs. for Medicare & Medicaid Servs. 4-5 (Jan. 5, 2024).[5]

65.    Agents and brokers, in turn—and the beneficiaries they serve—rely on this specific business model. *See, e.g.*, AmeriLife Comment Letter 4-5 (explaining that because FMOs are able to "pool the payments [they] receive from multiple carriers for [their] services," they have been able to "acquire, develop, and pay for technology systems, at scale," to provide essential support for independent agents and brokers that otherwise would not be available).

66.    A federal agency "must consider and respond to significant comments received during the period for public comment" in any rulemaking. *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). That imperative holds particular weight when the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Fox Television Stations*, 556 U.S. at 515. Yet CMS did not devote a single word of explanation to the costly upheaval of FMOs' concrete reliance interests. "Whatever potential reasons [CMS] might have given" for forging ahead with its change in policy, its failure to acknowledge that change and respond to the "serious reliance interests at stake" is enough to hold the Rule arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 224

---

[4] https://perma.cc/A9P2-4CDT.

[5] https://perma.cc/T8KZ-68NB.

67.   *Second*, even if CMS had acknowledged FMOs' serious reliance interests and accounted for the Rule's significant disruption to them, the agency still would have been required to "show that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox Television Stations*, 556 U.S. at 515); *see Judulang v. Holder*, 565 U.S. 42, 45 (2011) ("When[ever] an administrative agency sets policy, it must provide a reasoned explanation for its action."). CMS failed to offer any legitimate and record-backed explanation, much less one demonstrating that it is "necessary to overrule [the agency's] previous position." *Encino Motorcars*, 579 U.S. at 222.

68.   CMS asserts that capping administrative payments is necessary to protect beneficiaries because carriers supposedly have been using increasing administrative payments to agents and brokers to "circumvent" existing regulatory limits on enrollment-based compensation. 89 Fed. Reg. at 30,622. That finding was based on highly dubious assumptions, as commenters pointed out.

69.   For example, for the "belief" that payments are increasing, CMS relied on (undisclosed) "information shared by insurance associations and focus groups and published in research articles," as well as a single study by a private entity. *See* 88 Fed. Reg. at 78,554 & nn.136-137 (citing *The Commonwealth Fund, The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023)). Commenters explained the evidentiary inadequacy of that report, including that the 29 anecdotal accounts on which it was based do not constitute a statistically significant analysis of the hundreds of thousands of agents

and brokers serving 30 million Medicare Advantage beneficiaries throughout the country.  *See* Letter from Andrew S.M. Tsui of Greenberg Traurig, LLP to Chiquita Brooks-LaSure, Adm'r, Ctrs. for Medicare & Medicaid Servs. 8 (Jan. 5, 2024)[6]; Council for Medicare Choice Comment Letter 27-30.  CMS nevertheless proceeded to rely only on that report for the Final Rule without addressing the comments. *See* 89 Fed. Reg. at 30,619 & nn.154, 155.

70.    Commenters also explained, among other things, that "administrative payments are not steeply increasing" or even "keeping pace with inflation." Council for Medicare Choice Comment Letter 32.  To the extent the administrative payments have risen at all, the marginal increase was caused by recent CMS rules imposing more labor-intensive and costly requirements.  *Id.*  CMS did not address these comments, either.

71.    In any event, even if there was any record basis for the finding that carriers supposedly have been using increasing administrative payments *to agents and brokers* to "circumvent" existing regulatory limits on enrollment-based compensation, that basis was wholly arbitrary and unsupported *as applied to carrier-to-FMO payments not passed on to agents and brokers.*

72.    When carriers provide administrative payments to FMOs that do not enroll beneficiaries themselves, the payments are for the essential training, compliance, and other services those FMOs furnish to support their network of

---

[6] https://perma.cc/GB48-4935.

independent agents and brokers. *See* AmeriLife Comment Letter 5. AmeriLife and other FMOs "use those payments from carriers to perform the [agent-support] services . . . *on behalf of all of the carriers with which [they] contract*." *Id.* at 7. Because "no part of this funding from carriers contributes to any agent's or broker's compensation," *id.*, they are not "payments for these agents and brokers" on top of the "compensation caps," 89 Fed. Reg. at 30,449. Indeed, independent agents and brokers "have no visibility into the service payments [FMOs like] AmeriLife receive[] from carriers, so there is no way they would or could be influenced to sell one carrier's product over another based upon the funds [FMOs] receive from carriers to perform services on their behalf." AmeriLife Comment Letter 7.

73.    The Rule relied on the faulty (and unsupported) speculation that administrative payments "*are likely* to influence which MA plan an agent encourages a beneficiary to select during enrollment." 89 Fed. Reg. at 30,618 (emphasis added); *see, e.g.*, *id.* (administrative payments "may" be used to "influence" agents and brokers); *id.* at 30,617 (noting "opportunity" for violative behavior); *id.* ("may" be undue influence); *id.* (agency "believe[s]" that behaviors are driving complaints). To the extent CMS addressed payments not made to agents and brokers themselves, its findings focused on third-party marketing organizations that hire their own agents for enrollment—a model distinct from FMOs that provide support to independent agents and brokers that they do not employ. *See, e.g.*, 89 Fed. Reg. at 30,620. CMS violated the APA by not even purporting to evaluate the Rule's application to carrier-to-FMO payments for

agent-support services not passed on to agents and brokers. *See Motor Vehicle Mfs. Ass'n*, 463 U.S. at 43 (agency explanation lacking "rational connection between the facts found and the choice made" is arbitrary and capricious).

74.    *Third*, to make matters worse, the Rule chooses an artificial bump of $100 in compensation to account for administrative payments to agents and brokers—a number which the agency essentially picked out of a hat. *See* 89 Fed. Reg. at 30,625-30,626.  CMS acknowledged that the $31 increase it floated in the notice of proposed rulemaking was "too low." *Id.* at 30,625.  But then the agency arbitrarily picked $100 simply because "[s]everal commenters" had "suggested" that figure. *Id.* at 30,626.

75.    CMS never identified the comments on which it was relying or cited any evidence to substantiate the "belie[f]" that that amount "should" allow agents and brokers "to continue providing adequate service to Medicare beneficiaries." 89 Fed. Reg. at 30,626.  Nor did the agency offer any facts to justify its conclusory "belie[f]" that recommended "increase[s] of $200 or more" appearing in other comments "may have been inflated." *Id.*  Rather, CMS conceded that "the true cost of most administrative expenses can vary greatly" and "would be extremely difficult" to "accurately capture." *Id.* at 30,625.

76.    The unsubstantiated (and low) figure CMS chose arbitrarily, not tied to data, will narrow the options of services available for agents and brokers to seek out on their own—to the ultimate detriment of the Medicare beneficiaries they serve. *See, e.g.*, AmeriLife Comment Letter 6 ("There is no way that independent

agents, on their own, would be able to replicate the functionality that FMOs provide them with their limited resources.").  CMS did not adequately address that obvious problem.

77.    *Fourth*, in parallel with the changes to compensation, the Rule newly prohibits third-party marketing organizations, including FMOs, from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations.    89 Fed. Reg. at 30,599 (42 C.F.R. §§ 422.2274(g)(4) and 423.2274(g)(4) (as amended)).  This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan."  *Id.* at 30,604.

78.    Notably, the same data often qualify as "protected health information" under regulations implementing the Health Insurance Portability and Accountability Act ("HIPAA").  The HIPAA regulatory framework permits and encourages necessary sharing of protected health information, including "personal beneficiary data" under the Rule, among certain authorized entities, including FMOs in appropriate circumstances.  *See* 45 C.F.R. § 164.105(b).

79.    The final Rule overrides that HIPAA policy to the detriment of the beneficiary choice Congress intended to protect.    CMS brushed these inconsistencies aside, asserting that "the HIPAA Privacy Rule contains very specific disclosure and authorization rules that are more stringent" than the final Rule.  89 Fed. Reg. at 30,604.  Although HIPAA and its implementing regulations

adopt more reticulated standards for information sharing, CMS is wrong that HIPAA is more restrictive.

80.     *Finally*, CMS failed to consider viable alternatives that would be far less disruptive to the longstanding regulatory landscape.  Most obviously, the agency could have "clearly exclude[d] FMOs from the final rule" to avoid "the industry confusion created by the ambiguity of the language in the proposed rule." AmeriLife Comment Letter 11.  CMS also could have simply enforced regulations already on the books designed to resolve its asserted concerns.  *Compare, e.g.*, 89 Fed. Reg. at 30,618 (expressing concern that conversations with agents or brokers left beneficiaries "confused"), *with* 42 C.F.R. § 422.2262(a)(1)(iii) (prohibiting MAOs from "[e]ngag[ing] in activities that could" "confuse" beneficiaries); 89 Fed. Reg. at 30,617 (expressing concern that "golf parties, trips, and extra cash" are being paid to agents in exchange for enrollments), *with* 42 C.F.R. § 422.2274(a)(i)(B)-(D) (including "[b]onuses," "[g]ifts," and "[p]rizes or [a]wards" within compensation cap).

81.     Although CMS noted these comments, it did not consider them for the purpose for which they were offered—*i.e.*, as alternatives to proceeding with the flawed Rule.  Instead, the agency stated simply that it "will consider these suggestions" as potential grounds for "future rulemaking."  89 Fed. Reg. at 30,626. But CMS was required to consider such "'alternatives' that are 'within the ambit of the existing policy.'"  *Department of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (alterations omitted) (quoting *State Farm*, 463 U.S. at 51).

### C.    <u>CMS Trampled Procedural Requirements</u>

82.     AmeriLife is also likely to prevail in demonstrating that the Rule was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). CMS violated two key principles that have emerged from the requirement that "an agency shall afford interested persons general notice of proposed rulemaking and an opportunity to comment before a substantive rule is promulgated." *Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979).

83.     *First*, a final Rule that restricts carrier-to-FMO payments that are not passed on to agents and brokers is not a "logical outgrowth of the rule [CMS] originally proposed." *Miami-Dade Cnty. v. United States EPA*, 529 F.3d 1049, 1058 (11th Cir. 2008) (internal quotation marks omitted). CMS's initial proposal contemplated that administrative fees, even if regulated as "compensation" to agents and brokers, could still be paid by carriers to FMOs. 88 Fed. Reg. at 78,554-78,555. The notice gave no indication that CMS was considering cutting off payments from carriers to FMOs for agent-support services.

84.     Yet in the preamble to the final Rule, CMS stated for the first time that "the full payments" shall be made "directly to the agents and brokers," thereby "prohibit[ing] separate administrative payments." 89 Fed. Reg. at 30,624, 30,622. As explained above, if the Rule is construed broadly to prohibit carrier-to-FMO payments that are not passed along to independent agents or brokers, it would substantially transform commonplace contractual arrangements at great cost to the industry.

32

85.   *Second*, CMS failed to "make at least the most critical factual material that it used to support [its] position on review public." *Air Transport Ass'n of Am., Inc. v. United States Dep't of Agric.*, 37 F.4th 667, 677 (D.C. Cir. 2002) (internal quotation marks omitted); *see, e.g.*, *Time Warner Ent. Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("[A]n agency cannot rest a rule on data that, in critical degree, is known only to the agency.") (internal quotation marks and alterations omitted).  CMS refused repeatedly to disclose the particular evidence and analyses it relied on (but only vaguely referenced) in the rulemaking: *e.g.*, the "information shared by insurance associations and focus groups," "market surveys," "reports," "recent studies," information "published in research articles," "complaints," "information gleaned from oversight activities," and other supposed data purportedly underlying the final Rule.  *See* 89 Fed. Reg. at 30,617-30,626.

86.   AmeriLife and other FMOs undoubtedly would have "had something useful to say about this critical data" given that some of it apparently concerns the heart of their business practices.  *Chamber of Com. v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006).

## STATEMENT OF CLAIMS FOR RELIEF

87.   The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

88.   The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

89.   The APA also provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

90.   The APA further provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions" found to be, among other things, "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2).

91.   HHS and CMS are "agencies" whose final actions are reviewable under the APA.

92.   The Rule constitutes "final agency action" subject to judicial review.

## COUNT I

## DECLARATORY JUDGMENT

## Against All Defendants

93.   AmeriLife incorporates the above allegations by reference.

94.   As explained above, there is an actual controversy regarding the scope of the Rule's application. Although the Rule itself states that the compensation requirements subject to the agency-determined cap "only apply to independent

agents and brokers," 42 C.F.R. § 422.2274(d), some preambulatory language implies that the Rule may nevertheless sweep in carrier-to-FMO payments (even if not passed on to independent agents and brokers).

95.    AmeriLife and other FMOs have asked CMS to clarify that the Rule does not apply to payments from carriers to FMOs for agent-support services, for the reasons explained above.  42 C.F.R. § 422.2274(e).  CMS has refused to clarify the impact of the Rule (if any) on such payments.

96.    CMS's publication of a vague Rule and refusal to clarify the scope of its application deprive AmeriLife and other FMOs of the fair notice to which they are entitled.  The agency-generated uncertainty is harming the ability of carriers and FMOs, including AmeriLife and its subsidiaries and affiliates, to enter into agreements for next year, which must be finalized by the end of July 2024 due to a series of cascading deadlines.

97.    Accordingly, AmeriLife is entitled to a declaration that the Rule does not apply to payments from carriers to FMOs that are not passed on to agents and brokers.  28 U.S.C. § 2201.  AmeriLife is also entitled to further necessary or proper relief based on that declaration.  28 U.S.C. § 2202.

**COUNT II**

**ADMINISTRATIVE PROCEDURE ACT:
ACTION IN EXCESS OF STATUTORY AUTHORITY AND OTHERWISE
NOT IN ACCORDANCE WITH LAW**

**Against All Defendants**

98.    AmeriLife incorporates the above allegations by reference.

99.    If the Rule can be read to apply to carrier-to-FMO payments for agent-support services, Defendants acted in excess of statutory authority and otherwise contrary to law in promulgating the Rule.  5 U.S.C. § 706(2)(A), (C).

100.    Congress authorized Defendants to regulate "the use of compensation" only to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D).  Defendants invoked this authority in promulgating the Rule.  89 Fed. Reg. at 30,617.

101.    The Rule extends the meaning of "[c]ompensation" far beyond remuneration for relevant services rendered to encompass types of payments that Defendants have consistently acknowledged, until now, are not covered by that term.  42 C.F.R. § 422.2274(a), (e)(2) (as amended).

102.    Moreover, carrier-to-FMO payments for administrative services are not passed along to independent agents and brokers, and otherwise are not designed to, and do not, cause independent agents and brokers to steer individual beneficiaries to enroll in a specific plan.  Accordingly, and as explained above, such payments do not compensate individual agents and brokers for "enroll[ing]"

36

particular "individuals," and thus fall outside of Defendants' limited authority.  42 U.S.C. § 1395w-21(j)(2)(D).

103.   Defendants' actions have caused ongoing harm to AmeriLife, its subsidiaries, and its affiliates, and will continue to cause such harm if the Rule is applied to payments to FMOs for agent-support services.  Apart from a declaration that the Rule does not apply to such payments, AmeriLife has no adequate alternative to review under the APA.

104.   The Rule should be declared unlawful and vacated in relevant part, and Defendants should be enjoined from implementing or enforcing the Rule with respect to AmeriLife, its affiliates, and its subsidiaries.

## COUNT III

### ADMINISTRATIVE PROCEDURE ACT: ARBITRARY AND CAPRICIOUS ACTION

### Against All Defendants

105.   AmeriLife incorporates the above allegations by reference.

106.   If the Rule restricts payments to FMOs for agent-support services, it would also be arbitrary and capricious for several reasons.

    a.   Defendants did not display an awareness that they were changing their longstanding position.  Nor did Defendants take into account FMOs' serious reliance interests engendered by CMS's prior policy.

    b.   Defendants did not provide a logical explanation backed by record evidence, much less any good reasons, for redefining

compensation to include payments to FMOs for agent-support services.

c.   The Rule increased the compensation cap by an arbitrary amount purportedly to account for the broadened definition of "compensation," and Defendants did not adequately respond to comments raising legitimate concerns about the agency-determined amount.

d.   The Rule imposes prohibitions on FMOs' distribution of "personal beneficiary data" that are inconsistent with the HIPAA regulatory framework, and Defendants did not adequately account for or explain those inconsistencies.

e.   Defendants failed to consider viable alternatives to the Rule that would be far less disruptive, including more clearly excluding carrier-to-FMO payments for agent-support services from the Rule and enforcing regulations already in place that are designed to resolve CMS's asserted concerns.

107.   Defendants' actions have caused ongoing harm to AmeriLife, its subsidiaries, and its affiliates, and will continue to cause such harm if the Rule is applied to payments to FMOs for agent-support services.  Apart from a declaration that the Rule does not apply to such payments, AmeriLife has no adequate alternative to review under the APA.

108.   The Rule should be declared unlawful and vacated in relevant part, and Defendants should be enjoined from implementing or enforcing the Rule with respect to AmeriLife, its affiliates, and its subsidiaries.

### COUNT IV

### ADMINISTRATIVE PROCEDURE ACT:
### ACTION WITHOUT OBSERVANCE OF
### PROCEDURES REQUIRED BY LAW

### Against All Defendants

109.   AmeriLife incorporates the above allegations by reference.

110.   Defendants failed to observe procedural requirements in at least two key respects.

111.   First, if the Rule can be read to prohibit carrier-to-FMO payments for agent-support services, such application would not be a logical outgrowth of the proposed rulemaking that was noticed.

112.   Second, Defendants failed repeatedly to disclose the particular evidence and analyses they relied on, but only vaguely referenced, in the rulemaking, as illustrated by the many examples discussed above.

113.   Defendants' actions have caused ongoing harm to AmeriLife, its subsidiaries, and its affiliates, by depriving them of fair notice of the Rule's scope and limiting their opportunity to participate meaningfully in the rulemaking process.  Apart from a declaration that the Rule does not apply to payments to

FMOs that are not passed on to agents and brokers, AmeriLife has no adequate alternative to review under the APA.

114. The Rule should be declared unlawful and vacated in relevant part, and Defendants should be enjoined from implementing or enforcing the Rule with respect to AmeriLife, its affiliates, and its subsidiaries.

## **PRAYER FOR RELIEF**

For those reasons, AmeriLife respectfully requests that this Court:

(a)    preliminarily enjoin Defendants from implementing or enforcing the Rule with respect to payments to AmeriLife, its subsidiaries, and its affiliates for agent-support services (not passed on to agents and brokers) or, alternatively, stay the effective date of the Rule (in pertinent part) under 5 U.S.C. § 705;

(b)    enter final judgment (i) declaring that the Rule does not apply to payments to FMOs for agent-support services (not passed on to agents and brokers); or, alternatively, (ii) setting aside and vacating the Rule to the extent it applies to such payments and (iii) permanently enjoining Defendants or their designees from implementing or enforcing the Rule with respect to such payments to AmeriLife, its subsidiaries, and its affiliates;

(c)    award AmeriLife its attorney's fees and costs; and

(d)    award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Joseph W. Swanson

Dated:  May 29, 2024

Joseph W. Swanson
Florida Bar No. 29618
FOLEY & LARDNER LLP
100 N. Tampa St., Suite 2700
Tampa, FL 33602-5810
Telephone:    (813) 225-4161
Facsimile:     (813) 221-4210
Email:  joe.swanson@foley.com
Secondary Email:  dmills@foley.com

Pratik A. Shah
   (special admission motion forthcoming)
Kelly M. Cleary
   (special admission motion forthcoming)
James E. Tysse
   (special admission motion forthcoming)
Lide E. Paterno
   (special admission motion forthcoming)
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Telephone:  (202) 887-4000
Facsimile:  (202) 887-4288
pshah@akingump.com
kcleary@akingump.com
jtysse@akingump.com
lpaterno@akingump.com

Counsel to Plaintiffs AmeriLife Holdings, LLC, Network Insurance Senior Health Division ALG, LLC, and AmeriLife Marketing Group, LLC

41