## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| AMERILIFE HOLDINGS, LLC;<br><br>NETWORK INSURANCE SENIOR<br><br>HEALTH DIVISION ALG, LLC;<br><br>AMERILIFE MARKETING GROUP,<br>LLC, et al.,<br><br>               Plaintiffs,<br><br>      v.<br><br>CENTERS FOR MEDICARE &<br>MEDICAID SERVICES, et al.,<br><br>             Defendants. | No. 8:24-cv-01305-TPB-UAM |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

ROGER B. HANDBERG
United States Attorney

CAROLYN B. TAPIE
Assistant United States Attorney
USA No. 190
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6198
Email: Carolyn.B.Tapie@usdoj.gov

Counsel for Defendants

**Table of Contents**

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................3

    A.    Medicare Advantage ............................................................3

    B.    CMS's Persistent Concern (and Regulation) of Entities Involved
        in Medicare Advantage Marketing and FMOs. ....................................4

    C.    The Proposed Rule. ...........................................................8

    D.    The Final Rule. ................................................................9

    E.    The Lawsuit. ...................................................................11

ARGUMENT AND AUTHORITIES ...................................................................12

    A.    Plaintiffs are unlikely to succeed on the merits ..................................12

        1.    Plaintiffs received fair notice of how the Rule would apply
            to FMOs .................................................................12

        2.    CMS's authority to regulate the "use of compensation"
            includes proscribing administrative support costs. ....................15

        3.    The Final Rule is not arbitrary or capricious. ...........................17

        4.    CMS complied with any applicable notice-and-comment
            requirements ...........................................................20

    B.    Plaintiffs fail to show irreparable harm or that the other public-
        interest factors support the extraordinary remedy of a preliminary
        injunction. .....................................................................22

Conclusion .....................................................................................................25

## Table of Authorities

### Cases

*Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*,
   37 F.4th 667 (D.C. Cir. 2022) ...................................................21

*Alsop v. Desantis*,
   2020 WL 4927592 (M.D. Fla. Aug. 21, 2020) ..............................23

*Am. Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008)...................................................22

*BBX Cap. v. FDIC*,
   956 F.3d 1304 (11th Cir. 2020)..................................................17

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
   344 F. Supp. 3d 158 (D.D.C. 2018)............................................23

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985) ......................................................24

*Davidoff & CIE, S.A. v. PLD Int'l Corp.*,
   263 F.3d 1297 (11th Cir. 2001)..................................................12

*De La Fuente v. Kemp*,
   679 F. App'x 932 (11th Cir. 2017)..............................................23

*FCC v. Fox Television Station, Inc.*,
   567 U.S. 239 (2012) ..................................................................12

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ..................................................................25

*Manakee Pro. Med. Transfer Serv., Inc. v. Shalala*,
   71 F.3d 574 (6th Cir. 1995) .......................................................24

*Miccosukee Tribe of Indians of Fla. v. United States*,
   566 F.3d 1257 (11th Cir. 2009)..................................................18

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ....................................................................17

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013).........................................................................23

*Seiko Kabushiki Kaisha v. Swiss Watch Intern., Inc.*,
    188 F. Supp. 2d 1350 (S.D. Fla. 2002)........................................................23

*Siegel v. LePore*,
    234 F.3d 1163 (11th Cir. 2000).......................................................................22

*Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*,
    909 F.2d 480 (11th Cir. 1990) .........................................................................23

*SNR Wireless License Co., LLC v. FCC*,
    868 F.3d 1201 (D.C. Cir. 2017).......................................................................12

*St. Marie v. Ludeman*,
    2010 WL 924420 (D. Minn. Mar. 11, 2010) .................................................24

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017)........................................................................................25

*United States v. Jefferson Cnty.*,
    720 F.2d 1511 (11th Cir. 1983)........................................................................12

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ............................................................................................25

*Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ............................................................................................21

*VNA of Greater Tift Cty., Inc. v. Heckler*,
    711 F.2d 1020 (11th Cir. 1983)........................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 24 (2008) .................................................................................. 12, 22

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016).......................................................................24

**Statutes**

42 U.S.C. § 1395w-21(h)..................................................................4, 9, 15, 19

42 U.S.C. § 1395w-21(j)(2)(D) .....................................................1, 2, 5, 9, 15, 19

42 U.S.C. § 1395w-22(a) ........................................................................4

42 U.S.C. §§ 1395w-24(a)(6)(B)(iii) ........................................................4

Balanced Budget Act of 1997,
    Pub. L. No. 105-33, 111 Stat. 251 ..................................................4

Medicare Improvements for Patients and Providers Act of 2008,
    Pub. L. No. 110-275, 122 Stat. 2494 ..............................................5

## Rules and Guidelines

Final Rule,
    89 Fed. Reg. 30,448 (Apr. 23, 2024).......... 10, 11, 13, 14, 15, 16, 18, 19, 20, 21

Proposed Rule,
    88 Fed. Reg. 78,476 (Nov. 15, 2023) ...............................................8, 9, 21, 22

69 Fed. Reg. 46,866 (Aug. 3, 2004) ...........................................................4

73 Fed. Reg. 54,226 (Sept. 18, 2008) ....................................................6, 16

73 Fed. Reg. 67,406 (Nov. 14, 2008) .............................................6, 7, 15, 17, 19

76 Fed. Reg. 54,600 (Sept. 1, 2011) ..........................................................7

79 Fed. Reg. 1918 (Jan. 10, 2014) ............................................................4

Medicare Marketing Materials Guidelines (Rev. Nov. 1, 2005) ................................5

## Regulations

42 C.F.R. § 422.2274(a)(i)..................................................................13, 14

42 C.F.R. § 422.2274(e)(1) ..................................................................14, 16

42 C.F.R. § 422.2274(e)(2) ..................................................................13, 15

42 C.F.R. § 422.254 .........................................................................24

# INTRODUCTION[1]

Medicare Advantage enrollees often seek assistance to find the best plan for them and their healthcare needs. If, however, those tasked with guiding prospective enrollees through the enrollment process are motivated by financial incentives, rather than the best interest of the enrollee, enrollees might be sold plans that do not meet their particular needs. Congress was keenly aware of this potential perverse incentive structure, and to protect Medicare beneficiaries, Congress directed the Centers for Medicare & Medicaid Services (CMS) to limit Medicare Advantage plans' "use of compensation" in part to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D).

In the fifteen years since that mandate from Congress, CMS has enforced specific compensation limits for enrolling new beneficiaries or renewing current enrollees. And relying on the same statutory authority, CMS has likewise enforced a fair-market-value limit on payments to support related administrative activities. For years, those caps advanced the statutory goal of "ensur[ing] that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). More recently, however, CMS received

---

[1] Because of the expedited briefing schedule, CMS has not yet compiled the full administrative record (including things like audio files that cannot be submitted via ECF), but has included certified excerpts of that (forthcoming) administrative record in its appendix, which is cited as "App. __."

complaints that the Field Marketing Organizations (FMOs), which many agents and brokers use as go-betweens with plans, were manipulating administrative payments to get around the compensation limits. The generosity of those administrative payments varied by plan and created powerful incentives for agents and brokers to funnel a beneficiary into a higher paying plan instead of the plan that was best for the enrollee. As a result, CMS likewise noticed an astronomic increase in enrollee complaints that the plans they were steered to did not meet their expectations and needs.

To stop FMOs, agents, and brokers from circumventing the compensation limits in this way and to realign their incentives with beneficiary health needs, CMS promulgated after notice and comment a Final Rule that consolidated administrative payments with the other categories of allowable compensation and added $100 per enrollment to the dollar limit to account for administrative costs. (For reference, the national compensation limit without administrative costs is $611 for a Medicare Advantage plan in 2024.)

Plaintiffs decry these updates as "paradigm-shifting." But CMS has regulated administrative costs like training, customer service, and agent recruitment since at least 2008—the same year Congress passed the compensation statute—and the rule targets enrollment-based administrative payments that could circumvent the compensation limits. Under the regulation, FMOs can still receive from plans payments not tied to the enrollment of beneficiaries, contrary to Plaintiffs' incorrect assertion that this rule "prohibit[s] carrier-to-FMO payments that are not passed

along to agents and brokers." Money that is directed to FMOs for administrative payments tied to enrollment, which can create perverse incentives that harm Medicare Advantage enrollees, is limited to a set dollar amount. Plaintiffs concede that CMS can regulate compensation paid by plans to agents and brokers. Nothing in the statute exempts Plaintiffs simply because they serve as the go-betweens.

Plaintiffs filed suit asking this Court to enjoin portions of the Final Rule by the end of July. The Court should deny Plaintiffs' motion. Plaintiffs waited to file their motion until eight weeks after the agency posted the new rule, but now seek review on an emergency basis. But the government pays *plans* based on bids they submit in June, and plans use those funds to pay for things like administrative payments. Plaintiffs argue that the Final Rule will now affect their negotiations with plans, but an order enjoining that rule will not change the funding that will inform the negotiations, and the disruption to third parties (like plans) not before the Court that would result if the Final Rule were enjoined should be fatal to Plaintiffs' burden to obtain extraordinary preliminary relief. For these reasons, and because Plaintiffs' claim fails on the merits, the Court should deny Plaintiffs' motion.

## BACKGROUND

### A.   Medicare Advantage.

Medicare is a federal health insurance program for the elderly and persons with certain disabilities. Under Medicare Parts A and B—now colloquially known as traditional Medicare—the government pays providers for a participating beneficiary's covered health costs. Under Part C, or Medicare Advantage, the federal government

contracts with private health insurers to provide beneficiaries the coverage they would otherwise have received through Parts A and B. *See* 42 U.S.C. § 1395w-22(a).[2]

The premise of Medicare Advantage is that, within regulatory constraints, contracted plans "compete not only on price but on quality to attract beneficiaries' enrollment and to keep them enrolled over time." *See* 69 Fed. Reg. 46,866, 46,867 (Aug. 3, 2004). To give plans space to compete, the statute prohibits government interference with plans' contracts with providers. *See* 42 U.S.C. § 1395w-24(a)(6)(B)(iii). But healthy competition does not happen in a vacuum, and Congress requires CMS to closely monitor certain aspects of Part C to protect beneficiaries and the public fisc—as well as to ensure a level playing field to allow effective competition among plans. *See, e.g.*, 79 Fed. Reg. 1918, 1935 (Jan. 10, 2014).

**B.      CMS's Persistent Concern (and Regulation) of Entities Involved in Medicare Advantage Marketing and FMOs.**

Plan marketing is one such closely monitored aspect of Part C. The law that added Part C to Medicare required contractors to "conform to fair marketing standards" and directed CMS to review and approve all marketing literature. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 285-86 (codified at 42 U.S.C. § 1395w-21(h)). In other words, while Congress recognized that beneficiaries need to understand the differences between plans so that they can

---

[2] Consistent with Plaintiffs' briefs, to enhance readability, cites in this brief are only to Part C statutes and regulations, but the challenged Part D regulations work in a materially identical way.

choose the best one for their needs, it recognized the possible incentive to use aggressive tactics to steer beneficiaries to more profitable plans.

Based on Congress's directive, CMS issued guidance to prevent payments that favored "the financial interests of the person performing marketing" rather than guiding beneficiaries to "select the Plan most appropriate to the beneficiary's needs." Medicare Marketing Materials Guidelines at 137 (Rev. Nov. 1, 2005).[3] And because perverse financial incentives could affect anyone involved with selling plans, the guidelines covered compensation to brokers, independent agents, and any "*downstream contractor*." *Id.* at 138 (emphasis added).

Congress endorsed and built on CMS's approach in 2008 in the Medicare Improvements for Patients and Providers Act. In that law, Congress prohibited "[t]he use of compensation other than as provided under guidelines established by the Secretary." *See* Pub. L. No. 110-275, § 103(b), 122 Stat. 2494, 2500 (codified at 42 U.S.C. § 1395w-21(j)(2)(D)). Congress instructed that the guidelines "shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.*

Later in 2008, CMS published two rules implementing the statute. The first—published in September 2008—regulated certain payments and CMS explained that it

---

[3] https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovcontra/downloads/marketingguidelines_110105.pdf

expected "that plans will set compensation at levels that are reasonable and reflect fair market value for the services." 73 Fed. Reg. 54,226, 54,239 (Sept. 18, 2008). That expectation proved to be overly optimistic. CMS "received reports of compensation structures that are inconsistent with the intent" of the September 2008 rule, including contractors offering "extremely generous compensation" above historic compensation levels. *See* 73 Fed. Reg. 67,406, 67,408-09 (Nov. 14, 2008). CMS thus quickly amended its regulation and adopted a second rule, in November 2008, to cap agent and broker compensation at fair market value. *Id.* at 67,413.

The September 2008 rule defined "compensation" as "pecuniary or non-pecuniary remuneration of any kind relating to the sale or renewal of the policy," and not other "salary or other benefits related to employment" or "payment of fees to comply with State appointment laws, training, certification, and testing costs; and reimbursement for mileage to and from appointments with beneficiaries and reimbursement for actual costs associated with beneficiary sales appointments such as venue rent, snacks, and materials." 73 Fed. Reg. at 54,250-51. CMS did not suggest that its rule had defined the outer bound of the *statutory* term "compensation." *See id.* Indeed, the November 2008 rule separately addressed CMS's "concern[s]" about payments that fell outside its regulatory definition of compensation—including, specifically, "amounts paid to FMOs." 73 Fed. Reg. at 67,409.

CMS was particularly worried about downstream entities like FMOs or other third-party marketing organizations that did not themselves sign up beneficiaries, but

instead provided support for plans' marketing and enrollment efforts. Those organizations, CMS warned, "could engage in a 'bidding war' with respect to payments they retain, agree to contract to recruit agents, or perform other services only for [plans] that are the 'highest bidders' for their services." 73 Fed. Reg. at 67,410. Therefore, the 2008 rules capped other payments to such organizations at their fair market value, providing that if a plan uses "a third party entity such as a [FMO] or similar type [of] entity to sell its insurance products or perform services" like "training, customer service, or agent recruitment," then "the amount paid to the third party must be fair-market value and may not exceed an amount that is commensurate with the amounts paid by [the plan] to a third party for similar services in each of the prior two years." *Id.* at 67,413-14. Thus, by the end of 2008, CMS regulated all payments to agents, brokers, and third-party marketing organizations based on fair market value, regardless of whether they were payments for the sale or renewal of a policy or administrative payments.

While concerns about third party marketing organizations persisted, CMS continued to rely on its fair-market-value cap to control administrative costs, rather than setting a specific dollar cap, as it did for other compensation. *See* 76 Fed. Reg. 54,600, 54,621 (Sept. 1, 2011) ("Specifically, we are concerned that these FMOs or other similar entities could engage in a 'highest bidders' for their services."). CMS thus amended its regulations in 2011 to be clear that its "compensation rules would apply at all levels," including "payments made by plan sponsors to the FMOs, as well as the FMOs' agents." *Id.* at 54,623.

**Page 7**

C.    **The Proposed Rule.**

CMS gave notice of a proposed rule in 2023 to update its compensation regulations. *See* Proposed Rule, 88 Fed. Reg. 78,476, 78,551 (Nov. 15, 2023). CMS noted that large, consolidated plans had the opportunity "to use financial incentives outside and potentially in violation of the compensation cap." *Id.* at 78,552. This distortion meant that "smaller, local or regional plans that are unable to pay exorbitant fees to FMOs risk losing enrollees to larger, national plans who can." *Id.* at 78,553. As a result, administrative fees skyrocketed, including among third party marketers, which would in turn encourage additional consolidation and even more fees. *Id.* (*See also* App. 11379, 11381.)

Financial data CMS obtained from other plans revealed that there was wide variation in what FMOs might charge plans. As the size of the marketing organization increased, so did the payments. FMOs with the most business might receive more than twice the payments of a smaller FMO. (App. 11498, 11504.). At one meeting with a plan, the plan complained that the payments have "gotten out of control." (App. 11760.) As all this money filtered through the system, marketers began promising agents and brokers golf parties and trips if they worked with certain plans. 88 Fed. Reg. at 78,552. (*See also* App. 11378.) "The result," CMS concluded, was that agents and brokers were "presented with a new suite of questionable financial incentives" that could influence their advice—"an environment[] not dissimilar to what prompted CMS to engage in the original agent and broker compensation requirements in 2008." *Id.* To respond to these market realities, CMS

proposed to modify its approach to agent and broker compensation, citing 42 U.S.C. § 1395w-21(j)(2)(D) and 42 U.S.C. § 1395w-21(h).

First, CMS proposed to shift restrictions for enrollment-based payments from a fair-market-value cap to a uniform fair-market-value rate. This would prevent contractors from incentivizing agents and brokers to "favor some [more lucrative] plans over others" instead of "enroll[ing] individuals in the . . . plan that is intended to best meet their health care needs." *Id.* at 78,555.

Second, CMS proposed to consolidate administrative payments into the enrollment-based payments described above, rather than treating them separately. While administrative payments had long been subject to a fair-market-value limitation, CMS explained that the policy would prevent contractors from using separate payments for administrative services "to effectively circumvent the [fair-market-value] caps on agent and broker compensation." *Id.* at 78,555. CMS therefore proposed to increase the compensation rate by $31 to account for certain mandatory administrative services (e.g., annual training and testing as well as recording services for sales calls). *Id.* at 78,556. CMS based these numbers on the average time and expense associated with these administrative tasks. *Id.* at 78,597.

**D.    The Final Rule.**

CMS received thousands of comments in response to the Proposed Rule. CMS learned that "many [] plans, as well as third- party entities with which they contract (such as . . . FMOs . . . have structured payments to agents and brokers that allow for separate payments for these agents and brokers and have the effect of circumventing

**Page 9**

compensation caps." Final Rule, 89 Fed. Reg. 30,448, 30,449 (Apr. 23, 2024).

Groups from across the industry corroborated CMS's observation of a bidding war

using administrative "add-ons." (*See, e.g.,* App. 8911 (plan association stating that

"'add-ons,' ranging from marketing, administrative, technology, training and

compliance to bonuses, incentives for hitting enrollment targets or more," result in

"some brokers . . . collecting upwards of $1,300").) An FMO commented that

"[o]ver the last several years [national marketing alliances] and other FMO's" have

been "offering unlawful payments outside of" CMS's regulations, and "[i]ndividual

agents and agencies are being offered extra overrides disguised as 'marketing

dollars'" (App. 1841)—confirming CMS's independent research, 89 Fed. Reg. at

30,617-19. (*See* App. 11481, 11485 (report discussing FMO and agent/broker

consolidation and warning that it could inflate agent and broker payments while

"push[ing] out smaller agencies and insurers who cannot pay to compete").)

Several health researchers supported CMS's conclusion that standardizing

administrative payments would "reduce incentives for brokers to differentially steer

beneficiaries to higher paying plans and instead encourage the broker to help the

beneficiary make the best enrollment decision possible." (App. 7933.)

As a result, CMS finalized its proposal to eliminate a separate payment for

administrative services to prevent payments that circumvent the regulatory limits on

enrollment compensation. *See* 89 Fed. Reg. at 30,622. And CMS explained the effect

for FMOs: "our current policy does not extend to placing limitations on payments

from a[] [plan] to a [third party marketing organization] who is not an independent

agent or broker for activities that are not undertaken as *part of an enrollment* by an independent agent or broker." *Id.* at 30,626 (emphasis added). As CMS made clear, this rule change is intended to address enrollment compensation.

To determine the standardized rate, CMS relied on setting top-line numbers that factored in input from market participants, including about current rates—similar to how CMS calculated the cap on commissions back in 2008. CMS explained that focusing on a single top line would "create parity among agents, regardless of which plan, plan type, or type of Medicare enrollment they effectuate on behalf of the beneficiary." 89 Fed. Reg. at 30,625. And this also fit within the broader structure of Medicare Advantage by allowing "agents and brokers themselves [to] have the opportunity to decide which services are truly essential and how much those services are worth." *Id.* at 30,624. Calculating the right number, however, required a judgment call. Taking stock of comments, CMS agreed that the $31 it originally proposed was too low and would be insufficient to allow agents and brokers to continue adequately serving beneficiaries—a consequence CMS wanted to avoid. 89 Fed. Reg. at 30,625. CMS settled on increasing the compensation rate by $100 to account for administrative payments—towards the lower end of commenters' suggestions in part to avoid subsidizing non-Medicare plans when the same administrative systems are used to sell different plan types. *Id.* at 30,625-26.

## E.    The Lawsuit.

Eight weeks after the Final Rule was posted on the Federal Register's website, Plaintiffs (who are FMOs) filed a motion to enjoin preliminarily portions of the Final

Rule as it applies to Plaintiffs. The government now responds to the motion.

## ARGUMENT AND AUTHORITIES

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). To justify this "drastic remedy," the movants must "clearly establish[]" (1) that they have a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm without an injunction; (3) that the balance of equities tips in their favor; and (4) that preliminary relief serves the public interest. *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (citation omitted). Plaintiffs bear the burden of persuasion on each element. *See United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983). Plaintiffs have not met any of the factors and their motion should be denied.

**A.      Plaintiffs are unlikely to succeed on the merits.**

**1.      Plaintiffs received fair notice of how the Rule would apply to FMOs.**

Plaintiffs first argue that the Final Rule is invalid because they were not given fair notice that the rule would apply to FMOs, relying on *FCC v. Fox Television Station, Inc.*, 567 U.S. 239, 253 (2012). (AmeriLife Br. (ECF No. 16) at 9.) But in *Fox*, the agency departed from its prior precedent to apply, in an administrative adjudication, a new legal precedent to punish a broadcaster for something that the broadcaster had no reason to know would be illegal. *Id.* at 252; *accord SNR Wireless License Co., LLC v. FCC*, 868 F.3d 1201, 1028 (D.C. Cir. 2017) (cited in AmeriLife Br.

at 12) (as-applied challenge to agency adjudication). Plaintiffs' proposed application is—at best—an awkward fit here when they seek preliminary relief from a *regulation* that is not penal in nature, applies only prospectively, and most importantly, provides clear notice of what it covers.

As part of the rulemaking, CMS explained that when plans pay for administrative costs "on a 'per enrollment' basis," whichever one does so "at the highest rate would effectively be offering a higher commission per enrollee," creating "a conflict of interest for the agent" without violating existing regulations. 89 Fed. Reg. at 30,619-20. CMS, therefore, sought to stop the enrollment-based administrative payments that CMS determined were a work-around for the compensation limits. CMS therefore modified its regulation to (i) clarify that "administrative payments" are now included in "enrollment-based compensation," 42 C.F.R. § 422.2274(e)(2); (ii) incorporate into its enrollment-based compensation definition those administrative payments, *see id.* § 422.2274(a)(i)(E)-(G); and (iii) provide that "[b]eginning with contract year 2025, any other payments made to an agent or broker that *are tied to enrollment*, *related to an enrollment* in an MA plan or product, or *for services conducted as a part of the relationship associated with the enrollment into an MA plan or product*," *id.* § 422.2274(a)(i)(H) (emphasis added).

While Plaintiffs note they are not challenging the rule as applied to agents and brokers, Plaintiffs cannot feign confusion by disclaiming their role in facilitating the relationship between plans and agents and brokers simply because they serve as the go-betweens. Administrative payments tied to enrollments (outside of the $100

increase to the compensation limit included in the Final Rule), are no longer permitted to be paid to agents and brokers beginning with contracts for plan year 2025. This prohibition, therefore, applies to all payments made by plans for enrollment, regardless of whether the payment is made directly to an agent by the plan, or by the agent's representative or employer such as an FMO.

As Plaintiffs note in their own brief, CMS explained that this is not intended to place "limitations on payments from [a plan] to a [third party marketing organization, like an FMO] who is not an independent agent or broker for activities *that are not undertaken as part of an enrollment* by an agent or broker" 89 Fed. Reg. at 30,626 (emphasis added). Plaintiffs ask this Court to find the Final Rule does not apply to them because, according to AmeriLife, "payments from carriers to FMOs for agent-support services—namely, 'training, customer service, agent recruitment, [and] operational overhead do not influence brokers and agents they work with.'" AmeriLife Br. at 11 (quoting 42 C.F.R. § 422.2274(e)(1)). Plaintiffs provide no support for their contrary contention (including in the attached declaration to their brief). Regardless of Plaintiffs' unsupported position, the preamble to the Final Rule reasonably explains the risks associated with administrative payments paid based on enrollment. It is in those circumstances, CMS concluded, that it was likely that terms in contracts between FMOs and plans "can trickle down to influence agents," including using administrative payments to "'reward[]' agents who enroll beneficiaries into a specific plan." 89 Fed. Reg. at 30,620. Plaintiffs ignore that these activities are the type of administrative payments covered in 42 C.F.R.

Page 14

§ 422.2274(a)(i)(E) through (G) and that CMS has always limited those kinds of payments to FMOs, *see, e.g.*, 73 Fed. Reg. at 67,413-14. Therefore, despite Plaintiffs' protestations about the death knell to their business model, the Final Rule and its accompanying preamble make clear that FMOs may continue to receive and provide payment for services so long as they are not tied to enrollment, as outlined in the regulation. *See* 42 C.F.R § 422.2274(e)(2).

### 2. CMS's authority to regulate the "use of compensation" includes proscribing administrative support costs.

In promulgating the Final Rule, CMS relied on 42 U.S.C. § 1395w-21(j)(2)(D), which authorizes CMS to "establish limitations with respect to at least the following: . . . The use of compensation other than as provided under guidelines established by the Secretary," which in turn must at least "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." Likewise, 42 U.S.C. § 1395w-21(h)(4)(D) requires plans "and the agents, brokers, and other third parties representing such organization" to conform to "fair marketing standards" that include those limits. As CMS explained, those provisions "direct the Secretary to set limits on compensation rates," and provide the statutory basis for the Final Rule. 89 Fed. Reg. at 30,619. Indeed, FMO contracts with plans themselves refer to these administrative payments as "compensation." (*e.g.*, App. 11610, 11665-67, 11748.)

Plaintiffs' arguments that the Final Rule is nonetheless unauthorized as applied to FMOs are without merit. CMS found that when administrative payments

differ based on which plan an individual enrolls in, it can create perverse incentives for agents and brokers (89 Fed. Reg. at 30,620-21), regardless of whether those payments or incentives flowed through an FMO. When enrollment-based payments incentivize agents and brokers not to enroll individuals in the Medicare Advantage plan that best meets their health care needs, CMS can regulate, whether those payments are made to agents and brokers or to FMOs.

Plaintiffs incorrectly accuse CMS of changing its position about the meaning of the statutory term "compensation." AmeriLife Br. at 14. But the prior rules Plaintiffs point to do not purport to construe the outer limits of "compensation" as used in the statute. Instead, they clarify the "definition of compensation under our *rule*" and announce (again without purporting to fully define the statute) that those payments are "not *considered* compensation" for purposes of the then-extant regulations. 73 Fed. Reg. at 54,238 (emphasis added). Plaintiffs are correct that the agency previously defined administrative "[p]ayments made for services *other than enrollment* of beneficiaries" as "[p]ayments *other than compensation*." 42 C.F.R. § 422.2274(e)(1). But when a statute instructs an agency to issue guidelines to further a broad policy goal, it authorizes the agency to change tack when circumstances change and its prior approach is no longer the best way to fulfill that goal—so long as it still hews to its statutory authority and the Administrative Procedure Act (as here).

Plaintiffs also cannot explain why, if CMS interpreted the statute's concept of "compensation" to exclude administrative payments, CMS nevertheless has consistently regulated those payments since the statute's passage in 2008 without

challenge. *See* 73 Fed. Reg. at 67,413 (setting fair-market-value cap on administrative payments "to third party entity"). CMS's authority to do so, of course, was the statute's directive to limit "compensation"—even if CMS chose to refer to the payments as administrative fees in its regulations. It is Plaintiffs' interpretation, not CMS's, that would be a departure from the agency's longstanding practice, and so Plaintiffs are wrong that this was a change that CMS needed to acknowledge or further explain.

The actual change in policy was that the agency no longer believed that its regulations should account for administrative payments separately from other enrollment compensation. As discussed above, CMS acknowledged that change and explained why. For years, CMS relied on a "fair market" principle to regulate administrative payments, but once CMS saw a bidding war, the agency moved to protect beneficiaries. That is not a change to how CMS understood the statute, but a reasonable effort to consider regulatory alternatives that could best fulfill the statute.

**3.   The Final Rule is not arbitrary or capricious.**

Plaintiffs next argue that the Final Rule is arbitrary and capricious. But the Final Rule easily meets the "rationality" standard required on arbitrary and capricious review. *BBX Cap. v. FDIC,* 956 F.3d 1304, 1314 (11th Cir. 2020) ("So long as the agency's conclusions are rational, we will not set them aside."); *Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 43 (1983) (a court must "uphold a decision" of even "less than ideal clarity" so long as "the agency's path may reasonably be discerned" (internal quotation marks and citations omitted)). "The arbitrary and capricious

standard is 'exceedingly deferential.'" *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009) (citation omitted).

Plaintiffs claim that "CMS did not offer a logical or evidence-backed explanation, let alone 'good reasons,' for redefining 'compensation.'" AmeriLife Br. at 18. That is simply not true. The record is full of evidence to support CMS's explanation that the structure and amount of payments to FMOs can "influence or obscure the activities of agents and brokers," 89 Fed. Reg. at 30,618—evidence drawn from the contracts themselves (App. 11610, 11658, 11673, 11694, 11699, 11701) and the observations of market participants (App. 873-74, 1841, 11314). CMS's conclusion that other add-on payments inflated agent and broker compensations, 89 Fed. Reg. at 30,618, 30,623, is supported by the observations of market participants (App. 8911, 9954, 11379), as well as those of health care researchers (App. 7933). Even a plan representative admitted that the rates are "out of control." (App. 11760.) Similarly, CMS's concern about market concentration, 89 Fed. Reg. at 30,618-19, is supported by its analysis of publicly reported deals (App. 11479, 11481), as well as the experience of plan employees (App. 874), providers (App. 6210, 10390), and at least one FMO itself (App. 1841).

Plaintiffs claim that there is nothing to link administrative payments paid to FMOs to how agents and brokers behave. AmeriLife Br. at 20. In demanding empirical evidence of this link, Plaintiffs misunderstand the statutory standard: the statute authorizes CMS to promulgate compensation guidelines based on the "incentive" compensation structures create for agents and brokers. 42 U.S.C.

§ 1395w-21(j)(2)(D). In the Final Rule, CMS reasonably concluded that it was likely that terms in contracts between FMOs and plans "can trickle down to influence agents," including by using administrative payments, to "'reward[]' agents who enroll beneficiaries into a specific plan." 89 Fed. Reg. at 30,620. As CMS explained, because plans pay for administrative costs like travel expenses "on a 'per enrollment' basis," whichever one does so "at the highest rate would effectively be offering a higher commission per enrollee," creating "a conflict of interest for the agent" without violating the prior regulations. *Id.* at 30,619-20. As in 2008, CMS observed plans making high payments, and so limited those payments based on the incentives high payments provide. 73 Fed. Reg. at 67,409.

While CMS's stated rationale is all it needed under the statute, the record nevertheless corroborates CMS's reasoning. For example, as one plan explained, "[a]gency reactions to companies who pay low overrides, or none at all, is often to steer agents away from selling those plans at all." (App. 873; *see also* App. 7933.) So does the report of a focus group where agents and brokers admitted they were recommending plans based on relative commission rate. (*See* App. 11314-15.)

The key problem CMS sought to address was the use of administrative payments to circumvent CMS's agent and broker compensation rules, leading to unfair marketing under 42 U.S.C. § 1395w-21(h)(4) and incentivizing agents and brokers to prioritize their own financial well-being rather than beneficiary health needs, in violation of 42 U.S.C. § 1395w-21(j)(2)(D). *See* 89 Fed. Reg. at 30,619. While Plaintiffs assert the Final Rule is "wholly arbitrary and unsupported *as applied*

*to carrier-to-FMO payments not passed on to agents and brokers*" (AmeriLife Br. at 19)
(emphasis in original), that is not borne out by the comments and information
reviewed by CMS in the record.

As for claims that CMS did not respond to comments about FMO's reliance
interests and the effect on the industry, that is also untrue. In fact, CMS
acknowledged feedback from commenters about the effect on the industry, expressly
disavowed any desire to "drive[]" firms out of the industry, and explained that the
feedback had convinced the agency that its original $31 proposal was "too low,"
leading it to triple the amount to $100. 89 Fed. Reg. at 30,625. And in response to
comments that "FMOs would no longer provide agents and brokers with . . . extra
services," CMS stated that its Final Rule would give agents and brokers "the
opportunity to decide which services are truly essential and how much those services
are worth." 89 Fed. Reg. at 30,624.

**4.    CMS complied with any applicable notice-and-comment
requirements.**

Plaintiffs also critique the agency for allegedly not complying with procedural
requirements in the Administrative Procedure Act. CMS promulgated the Final Rule
after notice and comment and complied with all applicable procedural requirements.

First, Plaintiffs argue that CMS violated the logical outgrowth requirement by
restricting carrier-to-FMO payments that are not passed on to agents and brokers.
(AmeriLife Br. at 21-22 (quoting 89 Fed. Reg. at 30,622, 30,624).) That is not what
the Final Rule says. The language quoted by Plaintiffs simply predicts that

"removing the category of 'administrative payments' (i.e., overrides), would change the current flow of payments from an MA organization to agents and brokers for an enrollment." 89 Fed. Reg. 30,624. That statement does not impose any legal requirements, and so does not make the Final Rule vary in any way from the proposal. To the extent that Plaintiffs claim surprise that the Final Rule regulates payments to FMOs at all, that ignores the text of the proposed regulation, *see* 88 Fed. Reg. at 78,624, which as described above, applies to FMOs. And plenty of other commenters understood that the regulation affected FMO payments. (*See, e.g.*, App. 10235 (industry organization comment noting "the proposed rule would eliminate the separate regulatory provision for administrative payments" to FMOs).) AmeriLife cannot now legitimately claim surprise.

Next, Plaintiffs rely on out-of-circuit precedent to argue that the agency failed to disclose certain "critical factual material" for comment. (*See* AmeriLife Br. at 22 (quoting *Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*, 37 F.4th 667, 677 (D.C. Cir. 2022).) No such requirement exists in the Eleventh Circuit. The Court should decline to graft additional procedural requirements onto the APA. *See Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978) (reviewing courts must not "engraft[] their own notions of proper procedures upon agencies entrusted with substantive functions by Congress"). And as Justice Kavanaugh explained while on the D.C. Circuit, "[o]ne searches the text of APA § 553 in vain for a requirement that an agency disclose other agency information as part of the notice or later in the rulemaking process," and any requirement to disclose specific

factual material "cannot be squared with [its] text." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., concurring in judgment).

In any event, CMS disclosed sufficient materials for comment even under the D.C. Circuit's standard cited by Plaintiffs. As discussed, the heart of CMS's rule was its incentive analysis, which CMS included in the proposed rule. 88 Fed. Reg. at 78,553. And CMS also discussed other factors bearing on its analysis in the proposed rule, such as the complaints it received and the focus group. *See id.* at 78,554. While it did not publicly disclose to the public—and all competing FMOs and plans— the confidential financial information it obtained from plans, it did disclose that it was relying on "information gleaned from oversight activity." *Id.* at 78,556. Plaintiffs cite no case suggesting that an agency must choose between using sensitive data obtained through oversight and disclosing that sensitive data to the world and risking significant harm to regulated entities.

**B.  Plaintiffs fail to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction.**

Plaintiffs' motion should also be denied because Plaintiffs have not shown irreparable harm. "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Id.* (citation omitted); *see also Winter*, 555 U.S. at 22. Plaintiffs have made no such showing here.

"A district court should not issue a preliminary injunction unless it concludes that the movant will suffer immediate harm if relief is delayed until the case is finally resolved on the merits." *De La Fuente v. Kemp*, 679 F. App'x 932, 934 (11th Cir. 2017). Even if Plaintiffs could conceivably suffer irreparable harm at some point in the future, it has offered no reason to believe that harm "will occur before the district court can rule on [its] requests for a permanent injunction and declaratory relief." *Id.*

Plaintiffs' claim that they may incur monetary harm and face administrative uncertainty as they prepare for contract negotiations is not the proper basis of a preliminary injunction. "Even if denial of injunctive relief would present some monetary injury to the plaintiff[], . . . not finding *irreparable* injury" would be proper. *Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 487 (11th Cir. 1990) (emphasis in original). "Financial damage alone is insufficient to warrant injunctive relief." *Seiko Kabushiki Kaisha v. Swiss Watch Intern., Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002). Plaintiffs present no evidence that the result of these contract negotiations will result in financial ruin if the court does not intervene, describing the harm as an "administrative burden," "uncertainty" regarding their business model, and other economic harm. (AmeriLife Br. at 4, 23.) The alleged harm falls far short of what is required. *See Alsop v. Desantis*, 2020 WL 4927592, at *4 (M.D. Fla. Aug. 21, 2020) (Merryday, J.) (no irreparable harm from lost business opportunities); *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170-71 (D.D.C. 2018); *see also Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013) (cited in AmeriLife Br. at 23) (finding irreparable the "substantial

nature of the . . . harm" that constituted approximately "100% of [plaintiff's] revenues"). And if Plaintiffs think the government pays Medicare subcontractors too little, nothing prevents them from providing their services to other health plans that are not taxpayer-funded. *See VNA of Greater Tift Cty., Inc. v. Heckler*, 711 F.2d 1020, 1034 (11th Cir. 1983) (no irreparable harm to Medicare provider "being forced out of business"); *Manakee Pro. Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995) ("[E]ven if the Secretary's actions were to force a health care provider out of business, the injuries are not necessarily 'irreparable,' considering the risk known to the health care provider when it enters the Medicare program.").

Moreover, Plaintiffs waited almost two months to file the preliminary injunction, severely undermining their claim that irreparable injury is imminent. "A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *see also Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (ten-week delay undercut the claim of irreparable harm); *St. Marie v. Ludeman*, 2010 WL 924420, at *4 (D. Minn. Mar. 11, 2010) (similar for three-week delay).

Crucially, Plaintiffs' delay pushed the briefing schedule—and any eventual decision from this Court—well past the plans' June 3 deadline to submit their bids. *See* 42 C.F.R. § 422.254. Those bids determine the financial expectations of the plans for the next year—including their marketing budget and plan. Thus, even if the Court granted Plaintiffs relief by the end of July, plans presumably have already set their

overall marketing budgets for next year. Moreover, interfering in the rules surrounding the bid process now would disrupt plans' 2025 offerings, potentially distort the competitive landscape, and compromise the quality of the bids—all of which is an independent reason not to grant preliminary relief.

Finally, Plaintiffs have not shown that the balance of equities and the public interest support a preliminary injunction. A "court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) (citation and internal quotation marks omitted). Here, Congress required CMS to consider Medicare beneficiaries when regulating compensation for selling Medicare Advantage plans. When CMS recognized that administrative payments were being used to circumvent those rules, it acted to follow Congress's command to protect Medicare Advantage enrollees.

Finally, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). If the Court awards Plaintiffs some relief, it should extend only to Plaintiffs, only to the specific policies the Court finds likely unlawful, and only as broadly as necessary to remedy Plaintiffs' harms. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

## Conclusion

Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

*/s/ Carolyn B. Tapie*
CAROLYN B. TAPIE
Assistant United States Attorney
USA No. 190
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
Facsimile: (813) 274-6198
Email: Carolyn.B.Tapie@usdoj.gov

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that, on June 21, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have entered notices of appearance in this matter.

*/s/ Carolyn B. Tapie*
CAROLYN B. TAPIE
Assistant United States Attorney