UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
Tampa Division

AMERILIFE HOLDINGS, LLC;
NETWORK INSURANCE SENIOR
HEALTH DIVISION ALG, LLC;
AMERILIFE MARKETING GROUP, LLC,

          *Plaintiffs,*

      v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES; CHIQUITA
BROOKS-LASURE, in her official capacity
as the Administrator for the Centers for
Medicare and Medicaid Services;
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; and XAVIER
BECERRA, in his official capacity as the
Secretary of Health and Human Services,

          *Defendants.*

No. 8:24-cv-01305-TPB-UAM

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1
ARGUMENT ..............................................................................................................2
    I.    AMERILIFE IS LIKELY TO SUCCEED ON THE MERITS.................2
        A.    The Industry (Still) Lacks Fair Notice Of The Rule's Scope ................................................................................2
        B.    CMS's Asserted Rationale Falls Outside Statutory Bounds And Is Arbitrary And Capricious ................................4
        C.    CMS's Reasoning Lacks Record Support ................................. 8
    II.    THE EQUITABLE FACTORS FAVOR PRELIMINARY RELIEF ........9
CONCLUSION ........................................................................................................10

i

# TABLE OF AUTHORITIES

**CASES:**

*Department of Homeland Sec. v. Regents of Univ. of Cal.*,
  591 U.S. 1 (2020) ...................................................................................................4

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .................................................................................................5

*Georgia v. President of the U.S.*,
  46 F.4th 1283 (11th Cir. 2022) ..............................................................................10

*Hewitt v. Commissioner*,
  21 F.4th 1336 (11th Cir. 2021) ................................................................................3

*Lloyd Noland Hosp. & Clinic v. Heckler*,
  762 F.2d 1561 (11th Cir. 1985) ............................................................................... 8

*Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*,
  82 F.4th 1273 (D.C. Cir. 2023) ............................................................................... 8

*Ysleta Del Sur Pueblo v. Texas*,
  596 U.S. 685 (2022) ................................................................................................4

**STATUTE AND REGULATIONS:**

42 U.S.C.
  § 1395w-21(j)(2)(D) ............................................................................................4, 5

42 C.F.R.
  § 422.510(a)(2) .......................................................................................................3
  § 422.752(c)(1) .......................................................................................................3
  § 422.2274(a)(i)(H) .............................................................................................3, 4

89 Fed. Reg. 30,448 (Apr. 23, 2024) ............................................................*passim*

## INTRODUCTION

CMS's response only underscores the problems with its shape-shifting new Rule. On top of the rulemaking's conflicting indications about whether the re-definition of "compensation" applies to carrier-to-FMO payments *not passed on to agents or brokers*, CMS's counsel now pitches yet another interpretation: the Rule restricts all "enrollment compensation" (whatever that means) and otherwise permits unlimited carrier-to-FMO payments. But even that *post hoc* construction leaves AmeriLife and other regulated parties with no coherent understanding, much less fair notice, of the Rule's limits.

Whatever else the Rule may cover, CMS cannot rationally explain how proscribing fair-market-value payments to *FMOs* for *administrative services* fits its limited statutory purview to regulate *compensation* to *agents and brokers*. Where payments pooled from dozens of carriers (offering many more plans) do not flow to agents (who have "no visibility" into what FMOs receive), they do not skew agent-and-broker incentives. CMS's assertion that no "empirical evidence of this link" is needed just confirms its absence from the rulemaking.

No matter, according to CMS: Having ignored repeated requests for guidance, the agency now suggests that it is too late to stop the irreparable harms. But CMS recently reopened the relevant bid deadline in response to adverse court judgments and could do so again. Even absent a bid reopening, there is no question that the requested relief would affect the allocation of administrative payments between FMOs and agents. The Court should preliminarily enjoin the Rule.

1

# ARGUMENT

## I. AMERILIFE IS LIKELY TO SUCCEED ON THE MERITS

### A. The Industry (Still) Lacks Fair Notice Of The Rule's Scope

We still do not know to what extent the Rule covers FMO payments. Across 75 pages of briefing in this case and the related Texas suit, not to mention the 365-page preamble to the Rule itself, CMS has offered at least five different readings:

(1) The Rule "does not impose any legal requirements" that "restrict[] carrier-to-FMO payments," but "simply predicts that 'removing the category of "administrative payments" . . . would change the current flow of payments from [carriers] to agents and brokers for an enrollment.'" Opp. 20-21 (quoting 89 Fed. Reg. 30,448, 30,624 (Apr. 23, 2024)).

(2) The Rule may reflect a "binding statement about payment flow" after all, eliminating carrier-to-FMO payments and rerouting the payments directly to agents and brokers to give them "'the opportunity to decide which services are truly essential.'" Resp. 36, 44, *Council for Medicare Choice (CMC) v. HHS*, No. 4:24-cv-446 (N.D. Tex. June 3, 2024) (quoting 89 Fed. Reg. at 30,624), Dkt. 24 ("CMS Tex. Br."); *see* Opp. 20.

(3) Carrier-to-FMO payments are permitted, but only up to the specified "dollar limit," because the Rule "consolidate[s] administrative payments with the other categories of allowable compensation." Opp. 2.

(4) FMOs can "receive from plans payments not tied to the enrollment of beneficiaries" that are not "limited to a set dollar amount." Opp. 2-3, 14.

(5) "FMOs may continue to receive *** payment for services so long as they are not tied to enrollment," *i.e.*, for non-enrollment services even if paid on a per-enrollment basis (unlike (4)). Opp. 15.

Even considering just CMS's new focus on "enrollment compensation" (Opp. 11), its brief is internally inconsistent. In some places, CMS indicates the Rule applies to FMOs when "administrative payments [are] *paid based on enrollment*." Opp. 14 (emphasis added); *see* Opp. 2. Elsewhere, CMS indicates the Rule turns on whether payments are for "*activities* that [are or] are not *undertaken as part of*

2

*an enrollment.*" Opp. 10-11 (emphases added and omitted) (quoting 89 Fed. Reg. at 30,626); *see* Opp. 15 ("FMOs may continue to receive and provide payment *for services* so long as *they* are not tied to enrollment[.]" (emphases added)). Whether this "enrollment-based" restriction is payment- or service-based matters significantly to the FMO business model. But CMS leaves the industry guessing.

Moreover, neither category's scope is obvious. Which payments are not enrollment-based is unclear given the preamble statement that "*all* administrative payments are included in the calculation of enrollment-based compensation." 89 Fed. Reg. at 30,621 (emphasis added). Likewise, CMS's suggestion that "training, customer service, agent recruitment, [and] operation overhead" are enrollment-based services leaves uncertain which services would *not* qualify. Opp. 14. In fact, the types of activities may not matter after all: CMS says the Rule extends to any service "*conducted as part of the relationship associated with the enrollment into an MA plan or product.*" Opp. 13 (quoting 42 C.F.R. § 422.2274(a)(i)(H)).

CMS brushes aside the lack of fair notice by saying that AmeriLife seeks preliminary relief "from a *regulation* that is not penal in nature" and that "applies only prospectively." Opp. 13. But the paralyzing regulatory uncertainty carries serious risk. *See* 42 C.F.R. §§ 422.510(a)(2), 422.752(c)(1) (CMS may cancel contracts "inconsistent with" regulations and "impose civil money penalties" on AmeriLife's contracting partners). CMS cannot dispute that the "purpose of notice-and-comment rulemaking is to 'give[] affected parties fair warning of potential changes in the law.'" *Hewitt v. Commissioner*, 21 F.4th 1336, 1243 (11th Cir. 2021).

3

Remarkably, CMS does not point to any language in the Rule itself for applying its confusing "enrollment compensation" theory to FMO payments not passed on to agents. *Compare, e.g.*, Opp. 2 ("the rule targets enrollment-based administrative payments" generally), *with* 42 C.F.R. § 422.2274(a)(i)(H) (discussing enrollment-related "payments made *to an agent or broker*" (emphasis added)). Worse yet, the "impermissible '*post hoc* rationalization,'" *Department of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 21 (2020), just makes the Rule more of "an indeterminate mess," "[r]ather than supply coherent guidance" the industry seeks, *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022).

The Court should avoid this agency-created quagmire by declaring that the Rule does not apply to carrier-to-FMO payments that are not passed on to agents and brokers, *period*. Mot. 9-12. That is the best construction of the Rule; it would protect AmeriLife's fair-notice right; and it comports with CMS's limited authority.

### B. CMS's Asserted Rationale Falls Outside Statutory Bounds And Is Arbitrary And Capricious

**1.** If the Rule does restrict as "compensation" carrier-to-FMO payments not passed on to agents, CMS disputes that industry-reshaping reversal is even "a change that CMS needed to acknowledge." Opp. 17. According to CMS, when it continuously defined administrative payments as "[p]ayments *other than compensation*" for the past 16 years, it was not construing "'compensation' as used in the statute." Opp. 16. But what else was CMS construing if not the governing statute? "[O]f course," as CMS recognizes on the next page, "the statute's directive" in § 1395w-21(j)(2)(D)—creating "incentives for agents and brokers to enroll

4

individuals in the Medicare Advantage plan that is intended to best meet their health needs"—always shaped CMS's authority to regulate compensation. Opp. 17.

CMS also says it has "consistently regulated [administrative] payments since the statute's passage in 2008 without challenge." Opp. 16-17. But FMOs had no reason to challenge a rule providing that they should receive fair market value for their services. Regardless, CMS's argument proves AmeriLife's point. If an FMO obtained excessive funds *that it funneled to agents*, the payment would risk the skewed incentives § 1395w-21(j)(2)(D) addresses. AmeriLife agrees that "CMS can regulate" that pass-through payment as "compensation." Opp. 16. But that limited authority does not extend to fair-market-value payments, made in exchange for valuable services, *that are not passed on to independent agents and brokers* and thus do not cause them to steer beneficiaries toward poor-fitting plans.

**2.** That missing connection not only confirms that CMS's "actual change in policy" (Opp. 17) does not track the statute; it also underscores that CMS has not articulated "good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). CMS's primary rationale is that the Rule prevents FMOs from "manipulating administrative payments to get around the compensation limits." Opp. 2; *see* Opp. 19 (describing "key problem" as "use of administrative payments to circumvent CMS's agent and broker compensation rules"). But that concern warrants limiting the Rule to carrier-to-FMO payments passed on to agents and brokers, *i.e.*, circumventing the compensation cap. It is non-responsive to AmeriLife's narrow request for relief concerning non-pass-through payments.

5

Indeed, all the "reasonabl[e] conclu[sions]" CMS points to in support of its "stated rationale" assume scenarios in which payments "flow[] through an FMO" to agents or brokers. Opp. 16, 19. For FMOs to "us[e] administrative payments" to "'reward[]' agents who enroll beneficiaries in a specific plan," for example, the payments must "trickle down to influence agents." Opp. 19 (quoting 89 Fed. Reg. at 30,620). A plan "would effectively be offering a higher commission per enrollee" and "creating 'a conflict of interest for the agent'" only if payments were funneled to the agent. Opp. 13 (quoting 89 Fed. Reg. at 30,619-30,620). "[A]dd-on payments" do not "inflate[] agent and broker compensations" unless they ultimately are passed on to the agent and broker. Opp. 18.

AmeriLife agrees that "CMS has always limited those kinds of payments." Opp. 15; *see also* Opp. 10 (quoting comment about "unlawful payments"). Yet those pass-through payments are not at issue. The undisputed record evidence states that "service payments that carriers pay AmeriLife do not get passed through to selling agents and brokers." App.6031. AmeriLife's contracts with carriers have always prohibited that possibility. Accordingly, "no part of this funding from carriers contributes to any agent's or broker's compensation" to create "any incentive to agents and brokers to sell one carrier's product over another." *Id.* That reality does not change when non-pass-through carrier-to-FMO payments are "tied to enrollment." Opp. 3. AmeriLife "pool[s] the payments [it] receive[s] from multiple carriers" and uses them to perform services "*on behalf of all of the carriers with which [it] contract[s]*." App.6028-6031 (emphasis in original).

6

CMS also says it "saw a bidding war." Opp. 17. But instead of guarding against agents' incentives to enroll beneficiaries "in plans that do not meet their health care needs"—*i.e.*, the scope of § 1395w-21(j)(2)(D)—the preamble's "bidding war" discussion addressed "anti-competitive contract terms" that could cause "an unlevel playing field among plans." 89 Fed. Reg. at 30,618-30,619. Agency counsel cannot launder a "concern about market concentration" (Opp. 18) into a rationale for the distinct issue of agents' "financial incentives." 89 Fed. Reg. at 30,618.

In any event, administrative payments are not "generosity" (Opp. 2)—they are remuneration for vital services FMOs provide that carriers otherwise would provide (and do provide for captive agents who only offer plans from a single carrier, *see* Mot. 3). If an administrative payment does not reflect fair market value, the answer is to enforce the preexisting rule. Artificially capping all carrier-to-FMO payments "tied to enrollment," even those for fair market value that are not passed on to agents, would undermine CMS's asserted interest in competition. If anything, CMS's new view that carriers may make unlimited payments to FMOs for services not tied to enrollment would exacerbate bidding wars.[1]

**3.** Despite CMS's lip-service, Opp. 20, it cannot show it accounted for FMOs' reliance interests. How could FMOs operate under their current business model if they must depend on an uncertain (though certainly much lower) rerouted stream of payments from agents and brokers? CMS does not explain. Nor does CMS even

---

[1] CMS's claims also negate the premise that FMOs wield undue negotiating power. CMS Tex. Br. 17, 46 ("adhesion" contracts give carriers "ultimate control"); Opp. 2 (payments "var[y]").

7

suggest it considered how this upheaval—*e.g.*, the loss of efficiency enabled by pooled carrier payments to FMOs, App.6028-6030—affects beneficiaries.[2]

### C. CMS's Reasoning Lacks Record Support

Tellingly, CMS says no "empirical evidence" was required to "link administrative payments paid to FMOs to how agents and brokers behave." Opp. 18. But the APA requires more than speculation on the "ultimate issue CMS needed to answer under the statute: how do administrative payments affect agent and broker incentives?" CMS Tex. Br. 34. CMS had to "identify the data and methodology" it relies on in the "proposed rule." *Lloyd Noland Hosp. & Clinic v. Heckler*, 762 F.2d 1561, 1566 (11th Cir. 1985); *see Window Covering Mfrs. Ass'n v. Consumer Prod. Safety Comm'n*, 82 F.4th 1273, 1284 (D.C. Cir. 2023) (evidence must be disclosed "during the rulemaking," not in "a *post hoc* judicial proceeding").

Having disregarded that obligation, CMS misconstrues cherrypicked materials it now discloses for the first time. For example, CMS reads mischief into the fact that "FMOs with the most business might receive more than twice the payments." Opp. 8. Yet the cited contract shows merely that FMOs providing more services to more agents (and thus reducing transaction costs for carriers) may be paid more—"not [as] commissions," but in exchange for "non-marketing activities." App.11506. Because the anecdotes CMS now relies on were previously

---

[2] CMS notes it "triple[d] the amount" of its proposed administrative-payment cap to $100. Opp. 20. But that was in response to concerns that "*agents and brokers* would be driven out of the industry," not FMOs. 89 Fed. Reg. at 30,625 (emphasis added). CMS offers no evidence that its arbitrary $100 rate is "[]sufficient to allow agents and brokers" to serve beneficiaries. Opp. 11.

8

withheld, AmeriLife never had a chance to rebut the unproven allegations, like the comment from a single employee at one regional carrier (App.873) and from a few professors (App.7933) decrying that FMOs limit options from smaller regional carriers. The opposite is true. To be sure, AmeriLife can only contract with a finite universe of carriers, but it comprises "dozens" ranging "in size and geographic scope." Elliott Decl. ¶¶ 5-6; *see* App.6028. And agents often work with multiple FMOs to access a broader suite of plans they believe will best serve their beneficiary base. Anyway, "agents and brokers have no visibility into the service payments AmeriLife receives from [those] carriers, so there is no way they would or could be influenced to sell one carrier's product over another based upon th[ose] funds." App.6031.

Agency counsel misreads the only source the Rule actually cites when claiming "agents and brokers admitted they were recommending plans based on relative commission rate." Opp. 19 (citing App.11314-11315). That flawed study (*see* Mot. 19 n.8) says agents reported higher commissions for MA plans *than for Medigap plans*, not that agents pushed *some MA plans over others*. Nothing "corroborates CMS's reasoning" that carrier-to-FMO payments not passed on to agents somehow incent them to match beneficiaries with inapt MA plans. Opp. 19.

## II. THE EQUITABLE FACTORS FAVOR PRELIMINARY RELIEF

Given that CMS "predicts" the Rule will dismantle the FMO payment model, it does not seriously dispute the irreparable harms AmeriLife and other FMOs (like *amicus* Advocate Health) face. For good reason: Circuit precedent forecloses

9

CMS's halfhearted contention that "[f]inancial damage alone" is insufficient here, Opp. 23, since AmeriLife's "costs of complying" with the Rule are "unrecoverable," *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022).

Instead, CMS argues principally that relief would come too late—after the agency sat on AmeriLife's repeated requests for guidance—because carriers' "June 3 deadline to submit their bids" passed. Opp. 24. But CMS provides no evidence that all carriers have set lower overall field budgets because of the Rule. And even if less total money were available, the budgets would not constrain how carriers allocate administrative payments from that money between FMOs and agents— something the agency itself predicts the Rule will change (p. 2, *supra*).

Regardless, CMS omits the fact that *it recently reopened the bid deadline in response to adverse court rulings*. Notice of Supp. Material, *CMC v. HHS*, No. 4:24-cv-446-O (N.D. Tex. June 18, 2024), Dkt. 32-1 (Ex. A, at 2). There is no reason CMS could not extend the bid deadline again—particularly given industry participants' assurances that they are still negotiating contracts. Elliot Decl. ¶ 41; Advocate Health Br. 11, Dkt. 26-1; Hale Decl. ¶ 17. Far from "disrupt[ing]" plan offerings, Opp. 25, clarifying that FMOs can continue to receive fair-market payments for their services (as they have for 16 years) would ensure that FMOs can continue to support agents in matching beneficiaries with the most suitable plans for their health care needs.

## CONCLUSION

The Court should grant preliminary relief before the end of July 2024.

Respectfully submitted,

|  |  |
|---|---|
| Dated:  June 28, 2024 | _/s/ Pratik A. Shah_<br>Pratik A. Shah (admitted *pro hac vice*)<br>Kelly M. Cleary (admitted *pro hac vice*)<br>James E. Tysse (admitted *pro hac vice*)<br>Lide E. Paterno (admitted *pro hac vice*)<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Telephone:  (202) 887-4000<br>Facsimile:  (202) 887-4288<br>pshah@akingump.com<br>kcleary@akingump.com<br>jtysse@akingump.com<br>lpaterno@akingump.com<br><br>Joseph W. Swanson<br>Florida Bar No. 29618<br>FOLEY & LARDNER LLP<br>100 N. Tampa St., Suite 2700<br>Tampa, FL 33602-5810<br>Telephone:  (813) 225-4161<br>Facsimile:   (813) 221-4210<br>Email:  joe.swanson@foley.com<br>Secondary Email:  dmills@foley.com<br><br>*Counsel to Plaintiffs AmeriLife Holdings, LLC, Network Insurance Senior Health Division ALG, LLC, and AmeriLife* |

11